United States Court of Appeals,

Fifth Circuit.

No. 94-30180.

LOUISIANA DEBATING AND LITERARY ASSOCIATION, for itself and on behalf of its members, d/b/a The Louisiana Club, Plaintiff-Appellee,

v.

The CITY OF NEW ORLEANS, et al., Defendants-Appellants.

STRATFORD CLUB, for itself and on behalf of its members, Plaintiff-Appellee,

v.

The CITY OF NEW ORLEANS, et al., Defendants-Appellants.

The BOSTON CLUB OF NEW ORLEANS, Plaintiff-Appellee,

v.

The CITY OF NEW ORLEANS, et al., Defendants-Appellants.

PICKWICK CLUB, for itself and on behalf of its members, Plaintiff-Appellee,

v.

The CITY OF NEW ORLEANS, et al., Defendants-Appellants.

Jan. 26, 1995.

Appeal from the United States District Court for the Eastern District of Louisiana.

Before BARKSDALE and PARKER, Circuit Judges, and COBB[1], District Judge.

RHESA HAWKINS BARKSDALE, Circuit Judge:

At issue are whether the district court abused its discretion

in not abstaining from hearing this challenge by four clubs against

_____

[1]District Judge of the Eastern District of Texas, sitting by designation.

1

application to them of a newly enacted City of New Orleans ordinance prohibiting, *inter alia,* discrimination in places of public accommodation; and, absent an abuse of discretion, whether the clubs had private status of such a nature that such application, to include the ordinance's investigative and public hearing procedures, is violative of First Amendment "protect[ion] against unjustified government interference with an individual's choice to enter into and maintain certain intimate or private relationships" (right of private association). *Board of Directors of Rotary Int'l v. Rotary Club of Duarte,* 481 U.S. 537, 544, 107 S.Ct. 1940, 1945, 95 L.Ed.2d 474 (1987).

Following notification of administrative complaints (discrimination charges) being filed against them, the four clubs, claiming private status, sought to enjoin the City from enforcing the ordinance against them. The district court granted summary judgment, to include injunctive relief, holding that the ordinance, as applied to the clubs, violated their constitutionally protected right of private association. We AFFIRM.

I.

In late 1991, "to eliminate and prevent discrimination", the City adopted Chapter 40C of its Code. Section 40C-50.[2] The

---

[2]Section 40C-50 provides in part:

> In the City of New Orleans with its great cosmopolitan population consisting of large numbers of people of every race, color, creed, religion, age, physical condition, national origin and ancestry, many of them with disabilities, there is no greater danger to the health, morals, safety and welfare of the city and its inhabitants than the existence of groups

Chapter was based on a similar New York City ordinance, which, in 1988, had withstood a facial challenge to its constitutionality. *New York State Club Ass'n, Inc. v. City of New York,* 487 U.S. 1, 108 S.Ct. 2225, 101 L.Ed.2d 1 (1988). Among other things, the Chapter proscribes discrimination by entities that fall within the definition of a "public accommodation".[3] This term includes, *inter alia,* any club which has more than 75 members, "provides regular meal service", and

> regularly receives payment for dues, fees, use of space, facilities, services, meals or beverages, directly or indirectly, either from or on behalf of nonmembers or members for or in the direct or indirect furtherance of trade or business or from or on behalf of any persons who claim such

---

> prejudiced against one another and antagonistic to each other because of differences of race, color, sex, creed, religion, age, national origin or ancestry, or physical condition or disability or sexual orientation. The Council hereby finds and declares that prejudice, intolerance, bigotry, and discrimination and disorder occasioned thereby threaten the rights and proper privileges of its inhabitants and menace the institutions and foundation of a free democratic state. The New Orleans Human Relations Commission as created by Article I of this chapter is designated as an instrument of the city's power to eliminate and prevent discrimination in employment, in places of public accommodation, resort or amusement, in housing accommodations and in commercial space because of race, creed, religion, color, sex, age, sexual orientation, national origin, ancestry, or physical condition or disability whenever such discrimination is prohibited by provisions of this chapter or other city law; and said commission is hereby designated as the local Human Rights Commission for this city and is given such jurisdiction and power for such purposes as is conferred upon or authorized to a local Human Rights Commission under applicable state law.

[3]Section 40C-102 prohibits discrimination by a public accommodation "because of race, color, creed, religion, national origin, ancestry, or unreasonably, because of age, sex, sexual orientation, physical condition or disability."

payment as a business expense for tax purposes....
Section 40C-101(2).

As reflected in note 2, *supra,* the Chapter established the Human Relations Commission, which is charged with receiving and investigating complaints alleging violation of the Chapter.[4] Section 40C-53(a). Upon a complaint being filed, the Commission is to conduct a prompt investigation in order to make a probable cause determination. Section 40C-53(b). If the Commission finds probable cause, it may endeavor to eliminate the unlawful discriminatory practice through conciliation and persuasion. Section 40C-53(c)(1). As an alternative to, or concurrent with, the conciliation efforts, and following a public hearing, the Commission may issue a cease and desist order. Section 40C-53(c)(2)-(3). The hearing is conducted before a hearing officer designated by the Commission's Executive Director; rules of evidence are not applicable; and the case in support of the complaint is presented by the City's Department of Law or another representative designated by the Executive Director. Section 40C-53(c)(2).

The Chapter exempts "distinctly private entities". Section 40C-103.[5] Such entities are listed in a registry maintained by the

---

[4]The Chapter permits a complaint to be filed by any person claiming to be aggrieved by an unlawful discriminatory act or other prohibited act; additionally, the Commission may initiate the complaint. Section 40C-53(a).

[5]Section 40C-103 provides:

> A club or institution is distinctly private in character if either:

(1) a.  its services, accommodations, advantages, facilities, or privileges are not offered or available to the public or to a wide sector of the public exclusive of a class or classes discrimination against whom is prohibited by this article;

b. it is not an agent of the state or its creatures, agencies or subdivisions, and its activities do not constitute state action;

c. it does not advertise for or engage in general solicitation to attract potential customers, patrons, or members;

d. it does not fulfill a vital community role affected with public interest;

e. its activities are not subsidized directly or indirectly by public funds, nor does it otherwise receive governmental support;

f. it does not exist or operate for commercial or business purposes;

g. it generally denies its services, accommodations, advantages, and privileges and participation in its activities, meetings, and social functions to all but members and their guests;

h. its membership is of moderate size, and it is not connected with a larger institution, club or accommodation that is a public accommodation;

i. its organizers had the intention of constituting a private institution, club, or accommodation;

j. its organizational structure has not been altered since passage of the Civil Rights Act of 1964 in an attempt to avoid the applicability of that act, or since the date of the effectiveness of this chapter, in an effort to avoid the applicability of this article;

k. its members have a nexus of common interest;

l. its membership policies include an element of exclusiveness based on one (1) or more criteria other than membership in a class against whom discrimination is prohibited by this article;  and

Commission.  To be so listed, an entity must submit an application to the Executive Director, who then schedules a public hearing on the application.  Section 40C-103(d).  Prior to that hearing, the applicant must publish notice of the application and of the hearing.  *Id.*  "[A]ny interested person" may appear at the hearing in support of, or opposition to, the application.  *Id.*  If the applicant proves, by a preponderance of the evidence, that it is a "distinctly private entity", the Executive Director will certify it as such.  Section 40C-103(b).  This certification is valid for three years;  the entity must then repeat the process.  Section 40C-103(a).  Additionally, at anytime during this three-year period, the Executive Director, or any interested person, may initiate a complaint seeking to have the entity's distinctly private status revoked.  Section 40C-103(f).

On December 31, 1992, a resident of California filed four complaints with the Commission, alleging that, in 1992, four clubs located in the City had discriminated against him in his attempts to gain membership:   the Louisiana Debating and Literary

---

    m. it does not offer or constitute facilities, sponsor activities, or create an environment where business deals are often made and personal contacts valuable for business purposes, employment, and professional advancement are formed;  or

    (2) its character as an institution, club, or association is such that, under the constitutional doctrines of freedom of association (including expressive association) and privacy prevailing in the law at the time of the hearing, the Constitution of this state or of the United States requires that Section 40C-102 [ ("Unlawful practices") ] not be applied against it.

6

Association, the Stratford Club, the Boston Club of New Orleans, and the Pickwick Club (the Clubs).[6]  By letter dated February 12, 1993, the Commission's Executive Director notified the Clubs of the complaint, requested information from them, and advised them of possible options to resolve the complaint.

Approximately two weeks later, rather than responding to the letter, each club filed a separate action, pursuant to 42 U.S.C. § 1983, seeking:  (1) a declaratory judgment that the Chapter does not apply to them or, alternatively, that its application to them violates their federal constitutional right to privacy and freedom of association;  (2) a permanent injunction prohibiting any investigation of them pursuant to the Chapter;  and, (3) a permanent injunction enjoining the application, or attempted application, of the Chapter to them.[7]  The actions were consolidated, and the Clubs amended their complaints to add several

[6]The complainant made the following charge of discrimination:

> On July 16, 1992, and December 28, 1992, [the complainant] contacted several private clubs in New Orleans, Louisiana, in regards to obtaining membership. [The complainant] explained to them that he was a black man, and owned his own business in Los Angeles and San Francisco, California[,] and that he was going to be opening up a new business here in Louisiana.  He further explained that he was financially capable of becoming part of their organization and requested an application and membership information.  [The complainant] indicated that each organization that he contacted refused to send him an application or to provide any relevant information with respect to their membership criteria.

[7]The defendants were the City, the Commission, and its Executive Director, in his official capacity (collectively, "the City").

7

state law claims. Shortly after the actions were filed, the City advised the district court that it would not proceed with any investigation of the Clubs during the pendency of the litigation.

The City moved, in July 1993, to have the complaints dismissed for failure to state a claim or, in the alternative, to have the district court abstain from exercising jurisdiction based upon *Younger* and *Pullman* abstention doctrines. Upon denial of the motion that September, the City petitioned this court unsuccessfully for a writ of mandamus or prohibition.

Following extensive discovery, the Clubs sought summary judgment. The district court concluded, after a lengthy analysis, that the Clubs had

> demonstrated that [they are] private club[s] located at the most intimate end of the qualitative continuum of personal relationships. As such, [the Clubs] have a First Amendment right to enter into and maintain certain intimate human relationships without undue state intrusion and a right not to have their private affairs made public by the government. Moreover, [the Clubs] have established a substantial likelihood that [the City's] application of Chapter 40C to [the Clubs] would expose them to public revelation of their membership lists, their members' tax returns, and complete descriptions of all club activities, which would ultimately have a chilling effect on their members' First Amendment rights.

Accordingly, the court enjoined the City from investigating, pursuant to the Chapter, any charges of discrimination against the Clubs; it also enjoined the City from applying, or attempting to apply, the Chapter to the Clubs, because the inevitable attendant publicity, including public hearings for which private and sensitive information could be sought, would burden unduly the Clubs' and their members' First Amendment rights. The court

8

retained jurisdiction.

                                   II.

     When all is said and done, the City claims primarily that the
Clubs are not private, and are therefore subject to application of
the Chapter, because, notwithstanding their private trappings, long
history, and exclusivity, they control and dominate business in the
City;  that, despite undisputed evidence to the contrary, the
Clubs' business is business.  But, before reaching whether the
Clubs are private, and, if so, whether investigation of them
pursuant to the administrative complaints threatens unduly their
constitutionally protected right of private association, we must
deal with equally important issues of standing and abstention.  All
of these issues are but shorthand for this classic confrontation of
competing governmental interests and individual rights;  interests
and rights that bring into play "our Federalism" on the one hand,
and federal courts' protection of constitutional rights on the
other;  a balancing of governmental interests and individual rights
that reflects the majesty and scope of our living Constitution.

                                   A.

     The City contends that the Clubs fail to state any injury or
threatened injury that would entitle them to relief under § 1983;
and that, therefore, the complaints should have been dismissed for
failure to state a claim.  But, in essence, the City is asserting
lack of standing, a jurisdictional issue subject to plenary review.
*E.g., Xerox Corp. v. Genmoora Corp.,* 888 F.2d 345, 350 (5th
Cir.1989) (failure to allege injury raises standing, not failure to

                                   9

state a claim); *see, e.g., 7547 Corp. v. Parker & Parsley Dev. Partners,* 38 F.3d 211, 217 (5th Cir.1994) (standing raises jurisdictional issue); *Bogle v. Phillips Petroleum Co.,* 24 F.3d 758, 760 (5th Cir.1994) (jurisdiction subject to plenary review).

In *New York State Club Ass'n, Inc. v. City of New York,* 487 U.S. 1, 108 S.Ct. 2225, 101 L.Ed.2d 1 (1988), the Supreme Court rejected a similar contention. Immediately after New York City adopted the ordinance upon which the Chapter is based, a consortium of clubs and associations sought a declaratory judgment that the ordinance was facially unconstitutional. Despite no evidence of any enforcement or threatened enforcement, the Court ruled that the clubs "would have standing to bring this same suit on behalf of their own individual members, since those individuals "are suffering immediate or threatened injury' to their associational rights as a result of the [ordinance's] enactment." *Id.* at 9-10, 108 S.Ct. at 2232 (*quoting Warth v. Seldin,* 422 U.S. 490, 511, 95 S.Ct. 2197, 2211-12, 45 L.Ed.2d 343 (1975)); *see also City of Los Angeles v. Lyons,* 461 U.S. 95, 105, 103 S.Ct. 1660, 1666-67, 75 L.Ed.2d 675 (1983) (standing to seek injunction depends on whether the plaintiff is "likely to suffer future injury"); *Steffel v. Thompson,* 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974) (declaratory relief not precluded when official threatens prosecution under state statute forbidding handbilling).

Here, not only has the Chapter been enacted, but complaints (discrimination charges) have been filed with the Commission; and it has put the Clubs on notice. Thus, the threat to the Clubs' and

10

their members' associational rights is significantly greater than that faced in *New York State Club Ass'n.* This notwithstanding, the City maintains that no threatened harm exists because, if the Clubs can prove that they are protected by (fall within) the Chapter's "distinctly private entity" exemption, they would not be subject to any further regulation or threat to their constitutional rights.

But, under attack are the Commission's procedures and the investigation necessary to resolve, not only whether the Clubs are "distinctly private entities" under the Chapter, but also, the complaints filed against each. Furthermore, by requiring a triennial repetition of the exemption process, as well as permitting any individual to challenge the exemption during this period, the Clubs face the threat of further and potentially continual regulation by the City.

In sum, the filing with the Commission of discrimination charges pursuant to the Chapter presents the Clubs with a real and immediate threat to their associational rights. Accordingly, they have standing to challenge the Chapter.

B.

It goes without saying that abstention, under either the *Younger* or *Pullman* doctrines, is the exception. Accordingly, even if we determine that the preconditions for abstention have been met, we still review a district court's decision not to abstain only for abuse of discretion. *E.g., American Bank & Trust Co. of Opelousas v. Dent*, 982 F.2d 917, 922 (5th Cir.1993).

1.

11

Abstention under *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), "is generally deemed appropriate [when] assumption of jurisdiction by a federal court would interfere with pending state proceedings, whether of a criminal, civil, or even administrative character."  *Word of Faith World Outreach Center Church, Inc. v. Morales,* 986 F.2d 962, 966 (5th Cir.), *cert. denied,* --- U.S. ----, 114 S.Ct. 82, 126 L.Ed.2d 50 (1993).[8]

> *Younger* abstention can be applied to "state administrative proceedings in which important state interests are vindicated, so long as in the course of those proceedings, the federal plaintiff would have a full and fair opportunity to litigate his constitutional claim."  *Ohio Civil Rights* [*Comm'n v. Dayton Christian Schs., Inc.,* 477 U.S. 619, 627, 106 S.Ct. 2718, 2722-23, 91 L.Ed.2d 512 (1986) ].  We thus must answer three relevant questions:  (1) whether the state proceedings "constitute an ongoing state judicial proceeding;"  (2) whether the proceedings "implicate important state interests;" and (3) whether there is "an adequate opportunity in the state proceedings to raise constitutional challenges."  *Middlesex* [*County Ethics Comm. v. Garden State Bar Ass'n,* 457 U.S. 423, 432, 102 S.Ct. 2515, 2521, 73 L.Ed.2d 116 (1982) ].

*New Orleans Pub. Serv., Inc. v. City of New Orleans,* 798 F.2d 858,

---

[8]One of the more vital considerations underlying the doctrine is

> the notion of "comity," that is, a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways....  What the concept does represent is a system in which there is sensitivity to the legitimate interests of both State and National Governments, and in which the National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States.

*Younger,* 401 U.S. at 44, 91 S.Ct. at 750.

863-64 (5th Cir.1986), *cert. denied,* 481 U.S. 1023, 107 S.Ct. 1910, 95 L.Ed.2d 515 (1987).

The first of the three factors springs from the obvious point that "[w]hen no state proceedings are pending, a federal action does not interfere with or insult state processes and "the policies on which the *Younger* doctrine is premised "have little force...." ' " *Thomas v. Texas State Bd. of Medical Examiners,* 807 F.2d 453, 457 (5th Cir.1987) (*quoting Concerned Citizens of Vicksburg v. Sills,* 567 F.2d 646, 650 (5th Cir.1978) (*quoting Lake Carriers' Ass'n v. MacMullan,* 406 U.S. 498, 509, 92 S.Ct. 1749, 1756-57, 32 L.Ed.2d 257 (1972))). As noted, for *Younger* abstention, state proceedings must be ongoing and "judicial in nature". *See New Orleans Pub. Serv.,* 798 F.2d at 863-64; *Middlesex,* 457 U.S. at 432, 102 S.Ct. at 2521.

The district court ruled that *Younger* abstention was inappropriate because there was no ongoing state proceeding. The City does not attempt to controvert the "no ongoing proceeding" ruling. As a general rule, issues not presented adequately in a brief are deemed abandoned. *E.g., United States v. Ballard,* 779 F.2d 287, 295 (5th Cir.), *cert. denied,* 475 U.S. 1109, 106 S.Ct. 1584, 89 L.Ed.2d 916 (1986); Fed.R.App.P. 28(a)(6) (brief must "contain the contentions of the appellant on the issues presented"). But, because *Younger* abstention was raised in district court and briefed partially here, we will consider it.

Subsequent to the complaints being filed with the Commission against the Clubs at the end of 1992, the only administrative

13

activity has been the February 1993 letters to the Clubs. In fact, as noted, only a few days after this action was filed, the City advised the district court that it would not proceed with an investigation while this action was pending. Therefore, at issue is whether the complaint with the Commission and its notification letter "constitute an ongoing state judicial proceeding", *Middlesex,* 457 U.S. at 432, 102 S.Ct. at 2521, so as to satisfy the first prong of *Younger* abstention.

In *Dayton Christian Schools* and *Middlesex,* the Supreme Court held that the district courts should have abstained based on *Younger.* Unlike the present action, however, the regulating agencies in those cases had investigated the allegations, made determinations that probable cause existed, and served formal charges on the entities. *Dayton Christian Schs.,* 477 U.S. at 623-24, 106 S.Ct. at 2720-21; *Middlesex,* 457 U.S. at 428, 102 S.Ct. at 2519. In short, the state action had progressed significantly beyond that here.

We are confronted with a scenario closer to *Telco Communications, Inc. v. Carbaugh,* 885 F.2d 1225 (4th Cir.1989), *cert. denied,* 495 U.S. 904, 110 S.Ct. 1923, 109 L.Ed.2d 286 (1990). Following the filing of a complaint alleging prohibited conduct, and the commencement of an investigation, a state agency notified Telco, by letter, of the claimed violations and invited it to attend an informal factfinding conference. Following attendance at the conference, Telco sought federal court protection against further action by the state agency. *Id.* at 1227. In rejecting the

14

agency's contention that the letter to Telco constituted the start of administrative proceedings, the Fourth Circuit

> decline[d] to hold that *Younger* abstention is required whenever a state bureaucracy has initiated contact with a putative federal plaintiff. Where no formal enforcement action has been undertaken, any disruption of state process will be slight.... We hold, therefore, that the period between the threat of enforcement and the onset of formal enforcement proceedings may be an appropriate time for a litigant to bring its First Amendment challenges in federal court. Indeed, if this time is never appropriate, any opportunity for federal adjudication of federal rights will be lost.

*Id.* at 1229 (footnote omitted).[9] The City's contact with the Clubs has not progressed even as far as that in *Telco.*

We need not determine whether there was an ongoing state proceeding. As noted, we review a decision not to abstain only for abuse of discretion. As reflected above, the district court's ruling that there was no ongoing proceeding does not constitute an abuse of that discretion, especially in light of the fact that the City has not sought to controvert that ruling. Therefore, we need not proceed further in considering *Younger* abstention.

2.

Alternatively, under *Railroad Comm'n of Tex. v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), "federal courts should abstain from decision when difficult and unsettled questions of state law must be resolved before a substantial federal constitutional question can be decided." *Hawaii Hous. Auth. v.*

---

[9]Distinguishing between informal and formal proceedings, based on Virginia commonwealth law, the Fourth Circuit held also that the fact-finding conference was not "judicial in nature", an issue we need not address.

15

*Midkiff,* 467 U.S. 229, 236, 104 S.Ct. 2321, 2327, 81 L.Ed.2d 186 (1984). "*Pullman* abstention ... is addressed to the inappropriateness of federal court resolution of difficult or unsettled questions of state law and the undesirability of reaching constitutional questions that might be mooted by the application of state law." *Word of Faith,* 986 F.2d at 967.

As noted, "[t]he abstention doctrine is not an automatic rule applied whenever a federal court is faced with a doubtful issue of state law; it rather involves a discretionary exercise of a court's equity powers." *Baggett v. Bullitt,* 377 U.S. 360, 375, 84 S.Ct. 1316, 1324, 12 L.Ed.2d 377 (1964). More accurately, as also noted, abstention is the exception, not the rule. *Nissan Motor Corp. in U.S.A. v. Harding,* 739 F.2d 1005, 1008 (5th Cir.1984). Thus, our court has recognized that

> the extraordinary decision to stay federal adjudication requires more than an ambiguity in state law and a likelihood of avoiding constitutional adjudication. A district court must carefully assess the totality of circumstances presented by a particular case. This requires a broad inquiry which should include consideration of the rights at stake and the costs of delay pending state court adjudication.

*Duncan v. Poythress,* 657 F.2d 691, 697 (5th Cir.1981), *cert. dismissed,* 459 U.S. 1012, 103 S.Ct. 368, 74 L.Ed.2d 504 (1982).[10]

The City asserts that this case involves questions of state

---

[10]In rejecting *Pullman* abstention, the district court relied on three bases: (1) the Commission's proceedings did not provide the Clubs with an obvious method for securing a definitive ruling that could be pursued with full protection of their constitutional claims; (2) *Pullman* abstention is generally inappropriate where First Amendment or fundamental rights are at issue; and, (3) *Pullman* abstention turns on the existence of an ambiguous issue of state law, but neither party had demonstrated that the Chapter is ambiguous.

16

and local law which have never been adjudicated by a state court. Although the City acknowledges that this alone does not warrant *Pullman* abstention, it suggests abstention is still appropriate, by intimating that the Chapter is susceptible to an interpretation other than its plain meaning. Such a proposition defies one of the traditional principles of statutory interpretation, *viz.,* courts must first look at the plain meaning of a statute's language. Furthermore, *Pullman* abstention

> contemplates that deference to state court adjudication only be made where the issue of state law is uncertain. If the state statute in question, although never interpreted by a state tribunal, is not fairly subject to an interpretation which will render unnecessary or substantially modify the federal constitutional question, it is the duty of the federal court to exercise its properly invoked jurisdiction.

*Harman v. Forssenius,* 380 U.S. 528, 534-35, 85 S.Ct. 1177, 1182, 14 L.Ed.2d 50 (1965); *accord City of Houston, Tex. v. Hill,* 482 U.S. 451, 469, 107 S.Ct. 2502, 2514, 96 L.Ed.2d 398 (1987) ("[W]hen a statute is not ambiguous, there is no need to abstain even if state courts have never interpreted the statute."). The City has failed to identify, and we fail to find, any ambiguity in the Chapter which would support, let alone demand, abstention.

The City's second basis for *Pullman* abstention is that the Clubs raise state constitutional claims mirroring the federal constitutional rights claimed abridged.[11] The only time that a state constitutional provision may warrant abstention is when that constitutional provision is so interrelated with the statute or

---

[11]Because the district court found a First Amendment violation, it did not rule on the state law claims.

ordinance at issue that it can be said state law is ambiguous. *Examining Bd. of Eng'rs, Architects & Surveyors v. Flores de Otero,* 426 U.S. 572, 598, 96 S.Ct. 2264, 2279, 49 L.Ed.2d 65 (1976); *Pollard v. Cockrell,* 578 F.2d 1002, 1010 (5th Cir.1978). As the Supreme Court noted, "to hold that abstention is required because [an ordinance] might conflict with ... broad and sweeping [state] constitutional provisions, would convert abstention from an exception into a general rule." *Flores de Otero,* 426 U.S. at 598, 96 S.Ct. at 2279.

Finally, the City maintains that if the district court were to abstain, the Clubs' constitutional rights would not be infringed or suspended while their privacy claims are asserted in an administrative hearing. But, again, it is the Commission's very procedures and investigation which are at the heart of the threat to the Clubs' associational rights. *See Red Bluff Drive-In, Inc. v. Vance,* 648 F.2d 1020, 1032 (5th Cir.1981) ("in view of the high cost of abstention in the context of suits seeking review of statutes exerting a purported chilling effect on First Amendment rights, ... we cannot say that [the] district court abused its discretion in declining to invoke *Pullman* abstention"), *cert. denied,* 455 U.S. 913, 102 S.Ct. 1264, 71 L.Ed.2d 453 (1982).[12]

---

[12]Although *Red Bluff* involved a facial challenge to a statute, the court's recognition that abstention may result in a high cost to First Amendment rights is applicable in this case, despite being an as-applied challenge. As discussed, *infra,* the Commission's investigative powers and procedures strike at the heart and soul of the Clubs' and their members' associational rights. If the district court were to stay its hand while the City violates that which the Constitution protects, then the Clubs' and their members' First Amendment freedoms would be for

18

In sum, the district court did not abuse its discretion in declining to abstain.[13]  Therefore, we turn to the merits.

## C.

The critical substantive issues are whether the Clubs are private entities protected by the First Amendment;  and, if so, whether the Chapter's procedures interfere impermissibly with that protection.  But, first, we must consider whether the Clubs' challenge to the Chapter is facial or as-applied.

## 1.

The Clubs maintain they are challenging the Chapter only as applied to them.  The City counters that, in reality, it is a facial attack, requiring, therefore, that the Clubs demonstrate either (1) that the Chapter could never be applied in a valid manner, or (2) that, although it may be applied validly against the Clubs and others, the Chapter is so broad that it may inhibit the constitutionally protected rights of third parties.  *City Council of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 798, 104 S.Ct. 2118, 2125, 80 L.Ed.2d 772 (1984).

Although the City states correctly the standard applied in facial challenges, it misconstrues the relief the Clubs seek, the gist of their arguments, and the supporting evidence.  *See Bowen v. Kendrick,* 487 U.S. 589, 627-28, 108 S.Ct. 2562, 2584-85, 101 L.Ed.2d 520 (1988) (Blackmun, J., dissenting).  The Clubs contend

---

naught.  Furthermore, as discussed, other factors contributed to the district court's decision not to abstain.

[13]Of interest, as noted, the City waited almost five months after the Clubs filed suit to raise abstention.

19

that, based on their unique attributes, application of the Chapter would impermissibly interfere with their associational and privacy rights; they do not claim that the ordinance is incapable of being applied to any other entity or individual. Thus, we are faced with an as-applied challenge. *See Moore v. City of Kilgore, Tex.,* 877 F.2d 364, 390 (5th Cir.) (court will not consider a facial challenge to a regulation when plaintiff has succeeded in an as-applied challenge and when he failed to assert the rights of third parties), *cert. denied,* 493 U.S. 1003, 110 S.Ct. 562, 107 L.Ed.2d 557 (1989).[14]

2.

On three occasions during the 1980s, the Supreme Court addressed the extent to which the Constitution protects the associational freedom of private clubs. *New York State Club Ass'n,* 487 U.S. at 1, 108 S.Ct. at 2227-28 (1988); *Board of Directors of Rotary Int'l v. Rotary Club of Duarte,* 481 U.S. 537, 545, 107 S.Ct. 1940, 1945-46, 95 L.Ed.2d 474 (1987); *Roberts v. United States Jaycees,* 468 U.S. 609, 617-18, 104 S.Ct. 3244, 3249-50, 82 L.Ed.2d 462 (1984). These cases provide that the Constitution protects two types of associational freedom:

> First, the Court has held that the Constitution protects against unjustified government interference with an individual's choice to enter into and maintain certain intimate or private relationships. Second, the Court has

---

[14]In addition, we note the obvious: the Clubs have been identified through a discrimination charge as potential violators of the Chapter and have been so informed. Although the formal mechanism of the Commission's investigation has not been initiated, it would be just a matter of time before at least some, if not all, of the procedures went into play.

20

upheld the freedom of individuals to associate for the purpose of engaging in protected speech or religious activities.

*Rotary Club,* 481 U.S. at 544, 107 S.Ct. at 1945. This appeal implicates the former—private association.[15]

The right of private association protects the choice of individuals and organizations "to enter into and maintain certain intimate human relationships ... against undue intrusion by the State...." *Roberts,* 468 U.S. at 617-18, 104 S.Ct. at 3249.

---

[15]Because this case concerns clubs, we use the term "private association" to refer to the above referenced constitutional "protect[ion] against unjustified government interference with an individual's choice to enter into and maintain certain intimate or private relationships." *Rotary Club,* 481 U.S. at 544, 107 S.Ct. at 1945. For this protection, the term "intimate association" is sometimes used by courts; but, that term seems better suited for relationships, such as marriage, of a more intimate nature than those formed or forged in a private club.

In any event, and far more importantly, the Court acknowledged in *Roberts* that, to secure individual liberty, the formation and preservation of highly personal relationships must be protected against unjustified state interference. It then noted that the constitutional protection "afforded such relationships reflects the realization that individuals draw much of their emotional enrichment from close ties with others. Protecting these relationships from unwarranted state interference ... safeguards the ability independently to define one's identity that is central to any concept of liberty." *Roberts,* 468 U.S. at 619, 104 S.Ct. at 3250. Other private relationships identified by the Court as exemplifying these considerations, and thus being entitled to constitutional protection, included marriage, childbirth, the raising and education of children, and cohabitation with one's relatives. *Id.* at 619, 104 S.Ct. at 3250. But, the Court did not limit constitutional protection to familial situations; it recognized simply that these relationships possess those qualities which "are likely to reflect the considerations that have led to an understanding of freedom of association as an intrinsic element of personal liberty." *Id.* at 620, 104 S.Ct. at 3250-51. Based on an appreciation of this, the Court developed the factors, discussed *infra,* utilized in determining the extent to which an association is entitled to constitutional protection.

21

"Determining the limits of state authority over an individual's freedom to enter into a particular association ... unavoidably entails a careful assessment of where that relationship's objective characteristics locate it on a spectrum from the most intimate to the most attenuated of personal attachments."  *Id.* at 620, 104 S.Ct. at 3251.  In determining whether a particular association is sufficiently private to warrant constitutional protection, as well as the scope of that protection, the Court has considered several factors, including:  (1) the organization's size;  (2) its purposes;  (3) the selectivity in choosing its members;  (4) the congeniality among its members;  (5) whether others are excluded from critical aspects of the relationship;  and, (6) other characteristics that in a particular case may be pertinent.[16] *Rotary Club,* 481 U.S. at 546, 107 S.Ct. at 1946;  *Roberts,* 468 U.S. at 620, 104 S.Ct. at 3250-51.

Pursuant to our well-known standard of review for summary judgments, we conduct a *de novo* review of the summary judgment record to determine whether there is a genuine issue of material fact, and if there is none, whether the Clubs are entitled to

---

[16]Whether an organization is a private club arises more often in cases dealing with Title II of the Civil Rights Act of 1964.  *See* 42 U.S.C. § 2000a (barring discrimination in places of public accommodation).  In those cases, courts have examined other factors to determine whether Title II's private club exception applies.  The other factors include:  (1) the history of the organization;  (2) the use of facilities by nonmembers;  (3) whether the club advertises for members;  and, (4) whether the club is nonprofit or for profit. *Welsh v. Boy Scouts of Am.,* 993 F.3d 1267, 1276 (7th Cir.1993).  These additional factors may fall into the "other characteristics" category in considering an assertion of constitutional private association freedom.

judgment as a matter of law. *E.g.,* Fed.R.Civ.P. 56; *D.E.W., Inc. v. Local 93, Laborers' Int'l Union of N. Am.,* 957 F.2d 196, 199 (5th Cir.1992). The City contests two rulings on the merits by the district court: that the Clubs have private club status; and, that the Chapter, as applied, violates their constitutional rights.

Only to the extent that it challenges the private club status ruling does the City contest the district court's subsequent conclusion that the Clubs "are entitled to the fullest protection" of the First Amendment.[17] To do otherwise would run contrary to section 40C-103 of the Chapter:

A Club ... is distinctly private in character if ...:

....

(2) its character as an institution, club, or association is such that, under the constitutional doctrines of freedom of association (including expressive association) and privacy prevailing in the law at the time of the hearing, the Constitution of this state or of the United States requires that Section 40C-102 [ ("Unlawful practices") ] not be applied against it.

As noted, consistent with prevailing law, and as reflected in the criteria in the Chapter for establishing "distinctly private" status, the City must prove more than the fact that a club might serve to promote or advance business or a business relationship between, or for, its members.

_____

[17]After determining that no material fact issue existed and recognizing the spectrum upon which private relationships may fall, the district court evaluated the several factors and concluded that the Clubs "are entitled to the fullest protection of the First Amendment's right to privacy and freedom of intimate association" because they "met every factor in determining private club status and because they have very selective membership policies designed to ensure comradery and close personal acquaintances".

Obviously, business benefit might spring from any association, meeting, or encounter. It is well known that ofttimes it is "not what you know, but who you know"; and people often prefer, in any event, to do business with friends or acquaintances. But this fact alone cannot be the basis for whether a club receives private association protection under the First Amendment. If it were, no club could be private for purposes of that protection. The City—and the Chapter—recognize this; hence, the City must prove more (or, for summary judgment purposes, present a material fact issue).[18] *See, e.g., Roberts,* 468 U.S. at 633, 104 S.Ct. at 3257-

---

[18]In its brief, the City states that government "has absolutely no legitimate interest in the affairs of truly private Clubs who have not been interjected into public economic life; and [posits that] it may well be that the ... clubs will be determined to be distinctly private in the ... Commission proceedings." But, without any reference to the record, it then claims that the Clubs have been injected into public economic life:

> Surely a substantial issue of fact was raised as to the alleged "non-business" character of the Clubs. In terms of the City's legitimate interest in regulating trade and economic activity to prevent discrimination, the entanglement of a club in business affairs should not be ignored because the club has been consistently "exclusive"—when clubs become entangled in the public life of a community through subsidization by businesses who derive a business advantage from the club, "exclusiveness" (or discrimination against disadvantaged groups) is precisely the evil which the state seeks to inhibit under its police power. The state should not permit a business-related club—whose members derive tax and income advantages by having their businesses pay their dues and fees as a legitimate business expense—to insulate its discrimination from government regulations by showing how narrow[,] *long-standing,* and *thorough* it has been in excluding all but a select group of white non-semitic males of a limited ethnic genealogy.

> In a City in which both social institutions and major

24

58 (O'Connor, J., concurring).  But, as shown *infra,* it has failed totally to do so.

a.

The City maintains that the following creates a material fact issue, making summary judgment improper:  "the Clubs (especially the Boston Club) have historically been funded in large part by the businesses and professional entities of its members, reflecting that these business entities viewed club activities as being in furtherance of trade, business and professional advancement."[19]

_____

> economic institutions have historically been controlled and dominated by an "exclusive" small sector of society, it is obvious that the utility of "exclusive" clubs for business purposes within "our own" set will be recognized by historically "exclusive" economic institutions such as banks, law firms, and "old line" business companies.

(Emphasis by City.)

[19]As hereinafter quoted, in response to the Clubs' summary judgment motion, the City made a similar conclusional claim in district court;  it did not dispute the private status of those clubs on any basis except that they were places for promoting business:

> Plaintiffs are not entitled to a declaratory judgment or an injunction at this time because genuine issues of material fact relevant to their individual statuses preclude summary judgment.  Defendants do not contest Plaintiffs' claims and evidentiary support that they are ... non-profit corporations whose members have common social interests and congeniality;  that they each have selective and exclusive membership policies as well as restrictive (though very different) guest policies.  However, Plaintiffs' statutes remain at issue because some evidence exists to contradict their joint claims that they are not ... fora for their members to create or foster valuable business contacts or that they otherwise do not serve or operate to advance the employment and professions of many of their members.

25

But, this broad assertion has no support in the summary judgment record.  The City concedes that the *only* evidence supporting this broad assertion is that, in the past, a local bank paid fees for six of its officers at some of the clubs.[20]  The bank had paid for either their dues, luncheon expenses, or both.[21]  It is undisputed that these payments occurred.

### b.

In actuality, what the City contests is the legal significance to be accorded those payments;  no material fact issue exists in the summary judgment record.  The district court's conclusion that the Clubs constitute private entities entitled to the fullest protection of the First Amendment was not a finding of fact;  it was a conclusion of law based on that record.  But, before reviewing freely this legal conclusion, it is necessary to review what the record discloses.

### (i)

Founded in the 1800s, the Clubs have a longstanding history of existing exclusively for private, social purposes.  In addition to serving purely social functions, the Clubs prohibit the transaction

---

[20]Surprisingly, the City did not file a reply brief.  It made this concession at oral argument in response to a direct question on this point.

[21]With respect to the six bank officers, the bank had paid such expenses for all six at the Boston Club, for one at the Pickwick Club, and for one at Louisiana Debating.  We could not locate, nor did the City identify, any evidence indicating that any Stratford Club member's dues or expenses were paid by his employer.

26

or discussion of any business on their premises.[22]  In order to enforce this prohibition, no member or guest can display or offer a business card, or display business papers.  Accordingly, the Clubs have a purely social purpose and history.[23]

---

[22]Interestingly, it appears that the nonresident complainant's reason for wanting to join the Clubs was for business purposes, as reflected by the following deposition testimony by the Commission's Executive Director:

> Q. Do you know ... why [the complainant] elected to contact these four clubs?
>
> A. The information that he personally provided to the Commission, namely, myself ...—because that particular question was asked—was that he had intentions of establishing a business here in New Orleans—namely, a temporary personnel service, which is the same type of business that he has in San Francisco and San Diego, California.  It was his desire to initially try to become [a] member[ ] of not one but all four clubs for the purposes of establishing business relations and contacts necessary for him to start to meet potential clients for his business—at least, that was what was provided to me.
>
> Q. So [the complainant] fully intended to use the facilities of the clubs and the membership of the clubs for business purposes?
>
> A. Yes.

(*But see* note 6, *supra;*  the complainant stated that, in addition to San Francisco, his business was in Los Angeles, not in San Diego as testified by the Executive Director.)

[23]In contrast, the purpose of the Rotary Clubs was described as "to produce an inclusive, not exclusive, membership, making possible the recognition of all useful local occupations, and enabling the club to be a true cross section of the business and professional life of the community." *Rotary Club,* 481 U.S. at 546, 107 S.Ct. at 1946.  They sought inclusive fellowship based on diversity of interests. *Id.* at 546-47, 107 S.Ct. at 1946-47. Accordingly, the Supreme Court noted that this did not suggest "the kind of private or personal relationship to which we have accorded protection under the First Amendment." *Id.* at 547, 107 S.Ct. at 1946.

The Clubs' members share common social interests and backgrounds; often, the relationships predate membership in the Clubs through either family, religious activity, or other social groups. The criteria the Clubs use in selecting members include character, relationships and acquaintances, congeniality, and compatibility. Thus, a close nexus exists between the Clubs' purposes and membership criteria.[24]

Like the membership criteria, the admission process is very restrictive. Only existing members may propose a new member, and a proposal does not ensure admission. The Clubs engage in a fairly rigorous screening process to determine whether the prospective new member meets that club's criteria. Finally, whether to admit the prospective member is voted on by the general membership. A very limited number of objections deny membership: five at the Boston Club; three at each of the others.[25]

---

[24]In contrast, Rotary Clubs sought "to produce an inclusive, not exclusive, membership", and, in so doing, were instructed "to avoid "arbitrary limits on the number of members in the club,' and to "establish and maintain a membership growth pattern.' " *Rotary Club,* 481 U.S. at 546-47, 107 S.Ct. at 1946. As for the Jaycees, its local chapters were described as "basically unselective groups" who "[a]part from age and sex", did not "employ any criteria for judging applicants for membership, and new members [were] routinely recruited and admitted...." *Roberts,* 468 U.S. at 621, 104 S.Ct. at 3251.

[25]At the Jaycees, "new members [were] routinely recruited and admitted with no inquiry into their backgrounds. In fact, a local officer testified that he could recall no instance in which an applicant had been denied membership on any basis other than age or sex." *Roberts,* 468 U.S. at 621, 104 S.Ct. at 3251. Local Rotary Clubs were "instructed to "keep a flow of [membership] prospects coming' to make up for [a 10% annual] attrition [rate] and gradually to enlarge the membership." *Rotary Club,* 481 U.S.

Each club has only one facility, which is maintained for the exclusive use of its members and guests. No signs outside the Clubs' buildings identify the locations to the public.[26] Nonmembers are strictly prohibited from using the facilities.

Even though the Clubs permit members to bring guests, this practice is severely limited. Louisiana Debating prohibits its members from bringing or inviting any male guests, at any time and under any circumstances. Female guests are permitted rarely, but usually, they are the members' wives. At the Boston and Stratford Clubs, male residents of the City are strictly prohibited from attending as guests; women and children residents may be accompanied by a member, but on extraordinary occasions; the inviting of male nonresidents is strictly limited according to the time, frequency, and occasion of the visit. The Pickwick Club permits nonresident males to attend as guests during the noonday meals, provided the guest is a friend or close relative of the member and has some basis for a social acquaintance with other members; women and resident males are permitted, but only at limited times and with the approval of the club's Board of Governors.[27]

---

at 546, 107 S.Ct. at 1946.

[26]This is in stark contrast to the Rotary Clubs, which sought to keep their "windows and doors open to the whole world". *Rotary Club,* 481 U.S. at 547, 107 S.Ct. at 1947.

[27]For the Jaycees, "much of the activity central to the formation and maintenance of the association involve[d] the participation of strangers to that relationship." *Roberts,* 468

The Clubs are managed and controlled locally by their members; either directly, by an elected Board of Governors, or by both; none of the Clubs is associated with or controlled by a national organization. Additionally, the Clubs restrict total membership to a limited number. The Pickwick Club's regular members are limited to 500; Louisiana Debating, 325 residents; the Stratford Club, 350 residents and a limited number of nonresidents; and, the Boston Club, 600 residents and 400 nonresidents.[28] Additionally, the Clubs operate as not-for-profit corporations.

c.

Against this factual backdrop, we note again that the Chapter,

---

U.S. at 621, 104 S.Ct. at 3251. As for the Rotary Clubs, many of their "central activities [were] carried on in the presence of strangers" and "[m]embers [were] encouraged to invite business associates and competitors to meetings". *Rotary Club,* 481 U.S. at 547, 107 S.Ct. at 1946.

[28]The Jaycees' policy-making authority was vested in a national board consisting of delegates from local chapters; it had 7,400 local chapters. *Roberts,* 468 U.S. at 613, 104 S.Ct. at 3247. Rotary International had 19,788 local organizations in 157 countries. *Rotary Club,* 481 U.S. at 538-40, 546, 107 S.Ct. at 1942-43, 1946.

As for the number of members, the Jaycees had 295,000 national members, and Rotary International nearly 900,000 members. As Justice O'Connor recognized in *New York State Club Ass'n,* a club in a large city, such as New York, "with over 400 members may still be relatively intimate in nature, so that a constitutional right to control membership takes precedence" over the city's attempt to ban discrimination within the club. 487 U.S. at 19, 108 S.Ct. at 2237 (O'Connor, J., concurring). We note also that the Seventh Circuit determined that the Boy Scouts was a private club under the Civil Rights Act, despite having five million members. *Welsh,* 993 F.2d at 1276-77 (despite its size, Boy Scouts was still a private club because of its "plan or purpose of exclusiveness").

adopted in 1991, was modeled after the New York City ordinance at issue, in 1988, in *New York State Club Ass'n,* where the Court recognized that "there may be clubs that would be entitled to constitutional protection". *New York State Club Ass'n,* 487 U.S. at 12, 108 S.Ct. at 2234. Obviously, the Clubs are not similar to the Jaycees or the Rotary. Relatively small in size, they seek to maintain an atmosphere in which their members can enjoy the comradery and congeniality of one another. Employing very restrictive guest and admission policies, they seek to remain isolated. In light of the undisputed facts, including the isolated dues payments by a single employer, we conclude, as did the district court, that the Clubs constitute organizations whose location on the spectrum of personal attachments places them near those that are "most intimate".[29] Accordingly, they enjoy the

---

[29]As noted, the only evidence supporting the City's contention that the Clubs are not private entities entitled to constitutional protection was the limited payment of dues or luncheon expenses by a local bank for six of its officers who were members of at least one of the Clubs. Whether such payments should even be considered in evaluating the status of an organization has not been addressed by the Supreme Court, nor do we need to decide that question here. For purposes of this opinion, we assume, without deciding, that they should be considered.

     The City's reliance on these payments is evidently based, in part, on the Chapter's definition of "public accommodation". The definition includes clubs which "regularly receive[ ] payment for dues, fees, ... meals or beverages, directly or indirectly, either from or on behalf of nonmembers or members for or in the direct or indirect furtherance of trade or business...." Section 40C-101(2). As noted, this definition is based on the ordinance considered in *New York State Club Ass'n.* That ordinance covered clubs which had at least 400 members, provided regular meal service, and received regular payments "directly or indirectly from or on behalf of nonmembers for

31

fullest protection of their right of private association.

3.

Having determined that the Clubs are constitutionally protected private entities, we arrive at the critical issue in this appeal: whether the proposed investigation of the administrative complaints, as well as other Commission proceedings that might follow, threatens unduly the Clubs' right of private association. We conclude that it does.

Of course, as is also true for expressive associational rights, the constitutional right of private association is not protected absolutely against infringement by the state. As stated in *Rotary Club,* the protection is "against unjustified government interference". 481 U.S. at 544, 107 S.Ct. at 1945. As a fundamental right, however, any such infringement is subject to strict scrutiny. *McCabe v. Sharrett,* 12 F.3d 1558, 1566 (11th Cir.1994). Strict scrutiny analysis requires the government to demonstrate that (1) the state action serves a compelling state interest which (2) cannot be achieved through means significantly less restrictive of one's associational freedom. *See, e.g., Dart v. Brown,* 717 F.2d 1491, 1498 (5th Cir.1983), *cert. denied,* 469

the furtherance of trade or business." *New York State Club Ass'n,* 487 U.S. at 12, 108 S.Ct. at 2233.

In addressing the criteria in the New York ordinance, the Court stated that "[t]hese characteristics are at least as significant in defining the nonprivate nature of these associations, *because of the kind of role that strangers play in their ordinary existence....*" *Id.* at 12, 108 S.Ct. at 2233 (emphasis added). The City expanded the definition in *New York State Club Ass'n* to include payments received on behalf of, not only nonmembers, but also members.

32

U.S. 825, 105 S.Ct. 105, 83 L.Ed.2d 49 (1984). *See also Thomas v. Review Bd. of Ind. Employment Sec. Div.,* 450 U.S. 707, 718, 101 S.Ct. 1425, 1432, 67 L.Ed.2d 624 (1981) ("The state may justify an inroad on religious liberty by showing that it is the least restrictive means of achieving some compelling state interest"); *Clark v. Library of Congress,* 750 F.2d 89, 95 (D.C.Cir.1984) (burden is on the government to show strict scrutiny requirements are met).

As for the first prong of this analysis, it is uncontested that the eradication of discrimination in places of public accommodation constitutes a compelling state interest. Thus, the crux of this appeal is whether the means adopted by the City interfere impermissibly with the Clubs' right of private association. The City failed to address directly how its investigative methods and other procedures are the least intrusive interference with that right. Instead, in order to demonstrate that the procedures do not interfere impermissibly, the City addresses only three areas; it claims (1) that the Chapter would not require highly public proceedings; (2) that it could not demand membership lists from the Clubs; and, (3) that liberal discovery in the federal court proceeding to which the Clubs subjected themselves equates with the powers it possesses under the Chapter.[30] We consider these claims to be the City's attempt to

---

[30]These claims appear to be in response to the district court's conclusion that the Clubs established

> that there is a reasonable probability that the [Commission's] investigation into the complaints of

33

satisfy its burden of showing that its methods and procedures are the least intrusive.

In analyzing whether these identified City procedures are the least intrusive upon the Clubs' right of private association, we keep in mind that "associational rights "are protected not only against heavy-handed frontal attack, but also from being stifled by more subtle governmental interference,' ... and that these rights can be abridged even by government actions that do not directly restrict individuals' ability to associate freely." *Lyng v. International Union, United Auto. Aerospace & Agric. Implement Workers of Am.,* 485 U.S. 360, 367 n. 5, 108 S.Ct. 1184, 1190 n. 5, 99 L.Ed.2d 380 (1988) (*quoting Bates v. City of Little Rock,* 361 U.S. 516, 523, 80 S.Ct. 412, 416-17, 4 L.Ed.2d 480 (1960)).

a.

With respect to proceeding on the complaint, the investigation and hearing fail to ensure adequate safety for the Clubs' private association right.  The City attempts to demonstrate that any hearing would not be overly intrusive by relying upon Louisiana state statutes.   Specifically,  it  contends  that

discrimination would publicly reveal its membership lists and other intimate aspects of [the Clubs] that would have a chilling affect on their members' First Amendment rights....  The [Commission's] investigative powers include the right to compel production of documents and testimony of witnesses at a public hearing.  Judging from [the City's] First Request for Production of Documents, the breadth of the testimony and documents likely to be sought during the public hearings by the [Commission] is far-reaching and certainly contains private and sensitive Club matters deserving of constitutional protection.

34

La.Rev.Stat. 51:2262(F), in conjunction with the state's open meetings law (La.Rev.Stat. 42:6.1(A)(4) & (8)), provide an adequate safeguard against intrusion into the Clubs' intimate affairs.[31] At oral argument, however, while acknowledging that the hearing is public, the City suggested, without any positive support in the Chapter, that the information could be considered *in camera.*

The City's reliance upon state statute is misplaced for several reasons. First, state law does not compel the Commission to operate in executive session. The decision to do so is discretionary ("A public body *may* ..."). Thus, even if state law empowered the Commission to conduct its hearing in executive session, that is solely at the option of the Commission. Second,

_____

[31]La.Rev.Stat. 51:2262(F) provides:

> It is unlawful for a commissioner or employee of the commission to make public with respect to a particular person, without his consent, information obtained by the commission pursuant to its authority under this Section except as reasonably necessary to the conduct of a proceeding under this Chapter.

The open meetings law, La.Rev.Stat. 42:6, provides, in part, that "executive session shall be limited to matters allowed to be exempted from discussion at open meetings by R.S. 42:6.1." In turn, La.Rev.Stat. 42:6.1(A), provides, in pertinent part:

> A public body may hold an executive session ... for one or more of the following reasons:
>
> ....
>
>    (4) Investigative proceedings regarding allegations of misconduct.
>
> ....
>
>    (8) Or any other matters now provided for or as may be provided for by the legislature.

35

the City's reliance on La.Rev.Stat. 51:2262(F) attempts improperly to expand the statute's scope. It applies only to the Louisiana Commission on Human Rights, not the Commission created by the Chapter. *See* La.Rev.Stat. 51:2232(1) (" "Commission' means the Louisiana Commission on Human Rights").

Moreover, even if we assume that the Commission's investigative procedures and the hearing could be kept from being public, section 40C-7 directs the Commission, "after the completion of any hearing, [to] make a report in writing to the Mayor and City Council setting forth the facts found and its recommendations or decision...." The City has failed to indicate how such a disclosure will not infringe impermissibly upon the Clubs' right of private association.

b.

The City has failed also to demonstrate that the Chapter prevents it from demanding the Clubs' membership lists. The City maintains that section 40C-52 provides an adequate safeguard. The section provides that "[t]he Commission shall not require the production of names from a general membership list of any club that is a place of public accommodation."

But, the section refers only to "place[s] of public accommodation"; no membership list protection is provided for private clubs. The City claims that it would be absurd not to apply section 40C-52 to private clubs during its proceedings; but, the Chapter is very clear—a private club, *i.e.,* not a place of

36

public accommodation, is not protected.[32]

c.

By coming into federal court, the Clubs became subject to discovery; this may have resulted in their disclosing certain information, including about their members, which they would have otherwise preferred not to do. On the other hand, it is arguable that it is the least intrusive method available to them for the vindication of their right of private association. At least in federal court, the Clubs enjoy two protections unavailable before the Commission. First, they were before a neutral judge, not a hearing officer appointed by the Commission's Executive Director. Second, federal courts control the disclosure of evidence in discovery and at a hearing via rules of evidence and civil procedure; the Chapter provides that a Commission hearing "shall not be bound by the strict rules of evidence prevailing in courts of law or equity." Section 40C-53(c)(2). Additionally, the City stated at oral argument that, in conducting a hearing, it would be entitled to do everything it did in federal court with the exception of requesting membership lists. (As noted, it is far from clear that the City would not be able to obtain membership lists in a Commission proceeding.)

_____

[32]At oral argument, the City acknowledged that the Commission has the power to demand the tax returns of members, but asserted that they could be redacted in order not to disclose the members' names. (Apparently, this power flows from the Commission's subpoena power. Section 40C-53(a).) The power to mandate the disclosure of even redacted tax returns indicates how intrusive the Chapter probes into the private affairs of the Clubs and their members.

In sum, the City has failed to meet its burden of demonstrating how the means it has selected to enforce the Chapter are the least intrusive on the Clubs' and their members' right of private association.[33]  We hold, therefore, that the Chapter, as applied to the Clubs, is unconstitutional.

### III.

Discrimination can find no rest in a place of public accommodation.  Whether it should be suffered to abide in private clubs is debatable among persons of good will.  But, the Constitution trumps;  those clubs have a right of private association under the First Amendment with which the government may not interfere impermissibly.  Concomitantly, if those clubs must go public, in order to remain private, then their privacy rights ring hollow indeed;  "the flame is not worth the candle".

Perhaps the Clubs should have elected instead to seek an administrative "distinctly private" exemption under the Chapter;  no doubt, that might well have been the easier course.  But, the easier course is not the required course;  were it so, this would be a far different Nation.[34]  And, when persons seek to vindicate

---

[33]The district court has retained jurisdiction.  As noted, the City addressed only three items in seeking to meet its burden of demonstrating that its means are the least intrusive on the Clubs' private association right.  It goes without saying that our holding that it failed to meet its burden as to those three items should not be read to mean necessarily that, if it revised its procedures as to them, the Chapter would otherwise pass constitutional muster in this, or a similar, case.

[34]It is well to remember that, boiled down, individual liberty under the First Amendment is at stake.  *Roberts,* 468 U.S. at 618, 104 S.Ct. at 3249-50.  As already referenced,

constitutional rights in federal court, they will be heard, absent more compelling reasons under that same Constitution for the court to stay its hand. The judgment is

AFFIRMED.

. . . . .

> the constitutional shelter afforded [certain highly personal] relationships reflects the realization that individuals draw much of their emotional enrichment from close ties with others. Protecting these relationships from unwarranted state interference therefore safeguards the ability independently to define one's identity that is central to any concept of liberty.

*Id.* at 619, 104 S.Ct. at 3250. That, in the final analysis, liberty is at stake brings forward Patrick Henry's admonition, known to all, at the Virginia Convention in Richmond, against taking the easier course and not asserting one's rights in exchange for ease and comfort; it is as true today as it was in 1775:

> Is life so dear or peace so sweet as to be purchased at the price of chains and slavery? Forbid it, Almighty God. I know not what course others may take, but as for me, give me liberty or give me death!

Speech of Patrick Henry (Mar. 23, 1775) *in* THE REVOLUTIONARY YEARS 123, 125 (Mortimer J. Adler, ed., 1976).