**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

No. 94-40610


WILLIAM J. BARAN, ET AL.,

                              Plaintiffs-Appellees,

                    v.

PORT OF BEAUMONT NAVIGATION DISTRICT
OF JEFFERSON COUNTY TEXAS, ET AL.,

                              Defendants-Appellants,

                    and

STATE OF TEXAS,

                              Intervenor-Defendant-Appellant.


Appeals from the United States District Court
for the Eastern District of Texas


(June 21, 1995)


Before VAN GRAAFEILAND,[*] JOLLY and WIENER, Circuit Judges.

WIENER, Circuit Judge:

     Defendants-Appellants, the public Ports of Beaumont, Port
Arthur, and Orange ("Ports"), and Intervenor-Appellant the State of
Texas ("State"), (collectively "Appellants"), appeal a district

---

     [*]Circuit Judge of the 2nd Circuit Court of Appeals, sitting by
designation.

court order granting summary judgment in favor of Plaintiffs-Appellees the Sabine Pilots Association ("Pilots"), declaring that the second sentence of Article 8267(C)(5) of the Texas Revised Civil Statutes violates the Due Process Clause.

The Pilots filed suit against the Ports in federal district court, complaining that Art. 8267(C)(5) violates both the Due Process and Equal Protection clauses of the United States Constitution. The second sentence of that article, which is contained in the statutory framework for authorizing and fixing pilotage rates for the Sabine-Neches Waterway ("Waterway"), essentially grants the Ports the power to veto the pilotage rates for the Waterway as set by the Texas State Pilot Commission for the Sabine Bar, Pass and Tributaries (the "Commission"). The Pilots claim that this "veto provision" permits the Ports to veto the pilotage rates at their own rate-approval proceedings after opposing the proposed increases at the Commission hearings, thereby denying the Pilots the right to a fair and impartial tribunal in which to present their rate increase proposals. The Pilots also insist that the authority of the Ports to veto any pilotage rate increase effectively establishes a dual pilotage rate-making system between the public and private ports in the Waterway, in violation of the Equal Protection Clause. The private ports are not parties to this appeal.

Concluding that the district court erred as a matter of law in granting summary judgment in favor of the Pilots on the due process issue, we reverse and vacate that summary judgment and

2

render summary judgment in favor of Appellants.

## I

## FACTS AND PROCEEDINGS

All ships entering and leaving Texas ports must hire pilots to navigate the passages of the state's coastal waterways between those ports and the Gulf of Mexico. Each waterway in Texas is under the authority of its own pilot commission, which has jurisdiction over all facets of pilotage on the waterway in question, including the authority to set the fee schedule for pilots that navigate the passages into the waterway for the ships that enter and leave the waterway's ports. Any party interested in changing the pilotage rates for a waterway (pilots, consignees, owners, or ports) may submit a written application to the cognizant commission requesting a change in the fee schedule. To approve any rate changes, however, that commission must act in compliance with the statutory procedures, which require notice and hearings on the proposal, and must consider the effect of new rates on all legitimately interested parties.[1] Additionally, pursuant to Article 8267(C)(5), "no increase of rates to either the public ports . . . shall ever be set, established or granted unless the [boards of the ports] so affected shall approve the same."[2]

---

[1]See TEX. REV. CIV. STAT. art. 8267(C)(1),(2),(3),(4), and (6)(a) (West 1994). The commission is directed to consider the effect that its decision to grant, deny, or modify rates will have on the ports and citizens living within the commission's jurisdiction. TEX. REV. CIV. STAT. art. 8267(C)(6)(a) (West 1994).

[2]TEX. REV. CIV. STAT. art. 8267(C)(5) (West 1994).

The Ports are navigation districts created pursuant to the Texas constitution and acts of the state legislature. The Ports operate in accordance with Chapters 60-62 of the Texas Water Code, and are defined as "governmental agencies and bodies politic and corporate with the powers of government and with the authority to exercise the rights, privileges, and functions which are essential to the accomplishment of those purposes."[3] Generally, navigation districts are given substantial powers over the improvement, preservation, and conservation of inland and coastal waters and other purposes incidental to the navigation of those waters.[4]

In September 1992, the Pilots filed an application requesting a pilotage rate increase with the Commission. In accordance with the prescribed procedures, the Commission held public hearings on the Pilots' proposal. Representatives of the Ports attended the Commission hearings as parties legitimately interested in - and opposed to - the proposed rate increase. Only the Port of Beaumont, however, presented testimony at the hearing; and although that port's "evidence" was deemed to be time-barred by the Commission, Beaumont's materials were included in the reports submitted by the West Gulf Maritime Association, another group opposing the increase. The data from the Port of Beaumont supported the Ports' concern that the increased rates proposed were too high and would adversely affect the Ports' competitive positions.

_____

[3]TEX. WATER CODE ANN. § 62.102 (West 1988).

[4]TEXAS WATER CODE ANN. § 62.101 (West 1988).

4

Despite strong opposition to the proposed rate increases, the Commission approved the new rates, which went into effect at all private ports on the Waterway in November 1992. The rate increases did not go into effect at the Ports, however, as Art. 8267(C)(5) establishes that no rate increase affecting public ports can ever be set, established, or granted unless approved by the ports affected. In an effort to obtain such approval, the Pilots presented their proposal to the Ports, which thereafter denied the rate increases in their own proceedings.

After bringing suit against the Ports in federal court, the Pilots filed a motion for a summary judgment declaring that the veto permitted by Art. 8267(C)(5) violated the Due Process and Equal Protection clauses. Important to this appeal is the Pilots' claim that the second sentence of Art. 8276(C)(5) permits an "interested party" to adjudicate and veto pilotage rate applications, thereby denying the Pilots' their right to a fair hearing before an impartial tribunal.

The district court granted the Pilots' motion for summary judgment, declaring that the veto sentence does violate the Due Process Clause. In reaching this holding, the court determined that the Ports have a pecuniary interest in the flow of vessels through their ports that is affected by the pilot rates. As such, the court determined that the Ports' interest, when combined with the their veto power, denies the Pilots their right to a fair and impartial tribunal. The court then proceeded to "sever" the second sentence from Art. 8267(C)(5), declaring that the balance of the

statute remained operable.  Nevertheless, the court declined to enforce the Commission-approved rate increase at the Ports, leaving the "individual ports with the state court recourse provided by section 62.078 of the Texas Water Code."  The court also declined to address the Pilots' equal protection claim.  The Ports timely filed this appeal.

## II

## DISCUSSION

### A. STANDARD OF REVIEW

We review a grant of summary judgment using the same standards that guide the district court.[5]  Summary judgment is appropriate when no issue of material fact exists and the movant is entitled to judgment as a matter of law.[6]  Questions of law are reviewed de novo.[7]

### B. THRESHOLD ISSUE: ABSTENTION

Appellants argue on appeal that the district court erred in not abstaining from exercising its jurisdiction in what Appellants describe as an "on-going" state law dispute.  If we were to determine that abstention is appropriate in this instance, we would not need to review the merits of the district court's grant of summary judgment.  Thus we first focus our attention on abstention.

The Ports raised abstention as an affirmative defense in a

---

[5] Walker v. Sears, Roebuck & Co., 853 F.2d 355, 358 (5th Cir. 1988).

[6] Celotex Corp. v. Catrett, 477 U.S. 317, 323-25 (1986).

[7] Walker, 853 F.2d at 358.

6

somewhat cursory manner in their answer to the Pilots' complaint. In that answer the Ports asserted that abstention was appropriate because the dispute against them was not a constitutional dispute, arguing instead that the dispute was a local rate-making dispute over pilotage fees. The Ports also argued that, as the statute was fairly susceptible of an interpretation that would avoid the constitutional challenge, the district court should abstain from reaching the constitutional question until the Texas state courts had had an opportunity to render a definitive interpretation of the veto provision. The Ports' final argument in favor of abstention by the district court was that the case presents complex and significant issues of local policy that have been committed to the State legislative and executive branches.

The State too urged the district court to abstain from exercising its jurisdiction in this case. In its response to the Pilots' motion for summary judgment the State observed that "when the validity of a state statute or regulatory action is challenged in federal court by plaintiffs who have not first asserted their complaints in state court, the federal court should abstain from deciding the constitutionality of the statute pending review by a state tribunal." Even though the issue of abstention was raised once more in Appellants' post-hearing brief,[8] we note that the Ports did not reassert their abstention defense in responding to the Pilots' motion for summary judgment; neither did Appellants

_____

[8]There the Appellants merely observed that notions of federalism require the confinement of federal court intervention in state judicial processes.

7

argue the issue of abstention at the summary judgment hearing.

Although the notion of abstention was presented to the district court,[9] it did not address the issue in its opinion. As the decision whether to abstain is generally one involving some exercise of discretion by the district court, our first inclination would be to remand to the district court for it to resolve the abstention question before proceeding with the merits.[10]

In American Bank and Trust Company of Opelousas v. Dent,[11] we reviewed a district court order granting the defendant-appellee's motion to dismiss based on the Eleventh Amendment. In his motion to dismiss, the defendant urged the court in the alternative to dismiss the case against him under any one of three abstention doctrines: Younger, Burford, or Pullman. As the court granted the motion to dismiss based on the Eleventh Amendment, it did not address the abstention issue. On appeal the defendant-appellee asked us to consider alternatively the abstention doctrines and to affirm the dismissal on that basis. After concluding that the district court erred in dismissing the case, we turned to the alternative abstention arguments. We observed that the decision to

_____

[9]See, e.g., Portis v. First Nat'l Bank of New Albany, Miss., 34 F.3d 325 (5th Cir. 1994) (noting that issue is presented to trial court when party has raised it in pleadings or pretrial order or if issue has been tried by consent of parties).

[10]See, e.g., American Bank and Trust Co. of Opelousas v. Dent, 982 F.2d 917, 922 (5th Cir. 1993) (concluding that even if all preconditions for abstention are present in case, decision to abstain generally involves some exercise of discretion by district court).

[11]982 F.2d 917 (5th Cir. 1993).

8

abstain is generally one involving some discretion of the district court, and concluded that, as the propriety of abstention under <u>Burford</u> or <u>Pullman</u> was not absolutely clear on the record, it was advisable to remand the issue to the district court.[12]

But our review of abstention in the instant context convinces us that it would be inappropriate for the district court to abstain from exercising its jurisdiction in this case. Moreover, Appellants' own cursory treatment of abstention persuades us to forego remand of this meritless issue to the district court if for no other reason than that resolving the abstention issue is generally within the discretion of that court. In <u>National Association of Government Employees v. City Public Service Board of San Antonio, Tex.</u>,[13] we reiterated that, as a "trial court will not rule on claims - buried in pleadings - that go unpressed before the court," appellants' failure to urge their claims before the court may be construed as an intent to abandon those claims.[14] Although this maxim pertains to a determination whether a judgment is final for the purposes of appeal, we are satisfied that it supports our conclusion that we need not remand a meritless issue to the district court, particularly when the party urging that issue on appeal failed to develop and argue it fully in that court.

We discuss briefly the three abstention doctrines here

---

[12]<u>Id</u>. at 921-22.

[13]40 F.3d 698 (5th Cir. 1994).

[14]<u>Id.</u> at 705 (quoting <u>Vaughn v. Mobil Oil Exploration and Producing Southeast, Inc.</u>, 891 F.2d 1195, 1198 (5th Cir. 1990)).

9

implicated by the Appellants in their pleadings, illustrating why abstention - which is generally the exception, not the rule - is not appropriate in this dispute.[15]

1. *Younger* Abstention

Abstention under <u>Younger v. Harris</u>[16] is appropriate when federal court jurisdiction would interfere with pending criminal, civil, or administrative state proceedings.[17] For <u>Younger</u> abstention to apply, the pending state proceedings must be ongoing and judicial in nature.[18] When no state proceedings are pending, a federal action does not interfere with state processes, and the policies on which the <u>Younger</u> abstention doctrine is premised are unavailing.[19]

Clearly when, as here, no state judicial proceedings are pending, abstention under <u>Younger</u> is unavailable. Appellants' attempt to classify this dispute as a local rate-making controversy does not satisfy the standard for <u>Younger</u> abstention. Even though the rate-making dispute could possibly be classified as ongoing, it is not judicial in nature. In fact, the only state proceedings that could trigger abstention under <u>Younger</u> would be an action

---

[15]<u>Louisiana Debating and Literary Ass'n v. City of New Orleans</u>, 42 F.3d 1483, 1491 (5th Cir. 1995).

[16]401 U.S. 37 (1971).

[17]<u>Louisiana Debating and Literary Ass'n</u>, 42 F.3d at 1489; <u>Word of Faith World Outreach Center Church, Inc. v. Morales</u>, 986 F.2d 962, 966 (5th Cir. 1993), <u>cert. denied</u>, 114 S.Ct. 82 (1993).

[18]<u>Louisiana Debating and Literary Ass'n</u>, 42 F.3d at 1490.

[19]<u>Id</u>.

10

brought in state court by the Ports, challenging the Commission's approval of the pilotage rates, or some state court action brought by the Pilots challenging the Ports' rejection of the Commission-approved rate increase. As neither party has initiated any such state court action, there are pending no ongoing state judicial proceedings to suggest that the district court should have abstained from exercising its jurisdiction in this case.

### 2. *Burford* Abstention

We have previously described abstention under <u>Burford v. Sun Oil Co.</u>,[20] as follows:

> "[w]here timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are 'difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar'; or (2) where the 'exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.'" [21]

The underlying lawsuit in <u>Burford</u> challenged a highly technical and complicated regulatory scheme that affected the state's entire oil and gas conservation system. In an effort to address this complex scheme, the state had created a comprehensive centralized system for judicial review of orders affecting the scheme. In light of these circumstances, the Court in <u>Burford</u> determined that federal court abstention was proper to protect the state's administrative

---

[20]319 U.S. 315 (1943).

[21]<u>St. Paul Ins. Co. v. Trejo</u>, 39 F.3d 585, 588 (5th Cir. 1994) (quoting <u>New Orleans Public Serv., Inc. v. Council of City of New Orleans</u>, 491 U.S. 350, 361 (1989)).

process from undue federal influence.[22]  Although <u>Burford</u> abstention is concerned with protecting complex state administrative processes from undue federal interference, abstention is not mandated merely because an administrative process exists, or even "in all cases where there is a 'potential for conflict.'"[23]

In challenging Art. 8267(C)(5), the Pilots attack the very fact that the Ports have the power to veto pilotage rate increases, arguing that <u>any</u> veto power vested in the Ports is unconstitutional.  The Pilots do not claim that the Ports misapplied their lawful authority or that they failed to consider or balance properly the relevant factors in vetoing the pilotage rates.  Neither do the Pilots contend that the individuals who comprise the Ports had any disqualifying personal interest that would give rise to conflicts of interest in establishing the pilotage rates for the Ports.  Rather, the Pilots argue that, as the Ports are inherently biased, the provision in Art. 8276(c)(5) that grants the Ports a veto over the pilotage rates for the individual ports violates due process.  As the Pilots present a facial challenge to the statute – disputing the constitutionality of the Ports' authority to act at all – reaching the merits of this challenge will not intrude into any particular state administrative process or administrative order.  Thus, the policy concerns of <u>Burford</u> are not implicated and abstention under that doctrine would

---

[22]<u>Burford</u>, 319 U.S. at 332.

[23]<u>St. Paul Ins. Co.</u>, 39 F.3d at 589.

12

be inappropriate.[24]

### 3. *Pullman* Abstention

Appellants suggest that a third basis for abstention is found in <u>Railroad Commission of Texas v. Pullman Company</u>.[25] Under this abstention doctrine a federal court should abstain from exercising its jurisdiction when difficult and unsettled questions of <u>state</u> law must be resolved before a substantial <u>federal</u> question can be decided.[26] Generally, <u>Pullman</u> abstention is appropriate only when there is an issue of uncertain state law that is "'fairly subject to an interpretation [by a state court] which will render unnecessary or substantially modify the federal constitutional question.'"[27]

For a federal court adjudication to be stayed under <u>Pullman</u>, more than an ambiguity in state law and a likelihood of avoiding a constitutional ruling is required. Rather, the district court must assess the totality of the circumstances presented by a particular case, considering the rights at stake and the costs of delay

---

[24]<u>See</u> <u>New Orleans Pub. Serv., Inc. v. Council of City of New Orleans</u>, 491 U.S. 350, 363 (1989) (observing that federal court's inquiry into administrative agency's rate-making authority was limited to four corners of order denying rate increase and did not unduly intrude into processes or policy of state government).

[25]312 U.S. 496 (1941).

[26]<u>Louisiana Debating and Literary Ass'n</u>, 42 F.3d at 1491 (citing <u>Hawaii Hous. Auth. v. Midkiff</u>, 467 U.S. 229, 236 (1984)).

[27]<u>Id</u>. at 1492 (quoting <u>Harman v. Forssenius</u>, 380 U.S. 528, 534-35 (1965)).

pending state court adjudication.[28]   Even though a district court must assess the totality of circumstances before deciding whether to abstain, the decision to abstain under Pullman turns on the existence of an ambiguous state law.  In situations such as the one we consider today, in which there is no question of ambiguous state law - the interpretation of which will substantially modify or eliminate the constitutional question -  for a federal court to abstain from exercising jurisdiction over the case would clearly be inappropriate.[29]

Appellants suggest that Article 8267(C)(5) is fairly susceptible of a reading that would avoid the constitutional issue, yet they offer no credible argument or interpretation of that statute to support their abstention argument.  We read the plain language of Article 8267(C)(5) to mean unambiguously that there can be no increase of pilotage rates at the Ports unless the Ports approve the increased rates.  Even though it might be less than pellucid whether the statute intended to grant the Ports the power to veto the rates set by the Commission, or to permit a system of dual pilotage rates as between the public and private ports to

---

[28]Duncan v. Poythress, 657 F.2d 691, 697 (5th Cir. 1981), cert. dismissed, 459 U.S. 1012 (1982).

[29]See, e.g., Louisiana Debating and Literary Ass'n, 42 F.3d at 1491 and n.10 (affirming district court's decision declining to abstain, noting that one of the bases on which court declined abstention was fact that neither party had demonstrated that chapter of city code was ambiguous); Word of Faith World Outreach Center, 986 F.2d at 967 (observing that Pullman abstention is not proper unless state law in issue is fairly susceptible of an interpretation that might avoid or modify the federal constitutional question).

14

exist, resolving these ambiguities does not modify or eliminate the constitutional questions presented: Whether the veto violates due process, or the dual rate system violates equal protection, or both. We conclude, therefore, that, as the state statute under review is not fairly subject to an interpretation that will render unnecessary or substantially modify the federal constitutional questions raised by the Pilots, abstention under Pullman is not appropriate.

It follows, then, that as abstention under any of the above doctrines would not be appropriate in this dispute, the district court did not err in exercising its properly invoked jurisdiction. Thus, in the interest of judicial economy, and in an effort to move this litigation forward expeditiously, we proceed to consider the merits of this dispute.[30]

C. SUMMARY JUDGMENT BASED ON DUE PROCESS

Appellants challenge the district court's grant of summary judgment in favor of the Pilots. Specifically, Appellants contend that the court erred in concluding that the Ports have such a pecuniary interest in the flow of vessels to and from their ports that giving the Ports a final "veto" over the pilotage rates

---

[30]See, e.g., Burns v. Watler, 931 F.2d 140, 147 (1st Cir. 1991) (observing that, despite cases in which appellate court recognized that district court was better positioned to perform abstention analysis, simplicity of factual situation before appellate court and potential prejudice to parties for further delay advised court to perform evaluation itself). Cf. Snap-On Tools Corp. v. Mason, 18 F.3d 1261, 1267 n.7 (5th Cir. 1994) (reviewing district court's dismissal of case on abstention grounds; noting that when abstention is clearly unwarranted, rather than remand case back to district court to consider substantive merits, appellate court should consider merits of case and move litigation along).

deprives the Pilots of their due process right to a hearing before a fair and impartial tribunal.

At the outset we note that the Pilots state repeatedly that they are not challenging the quality or quantity of the Ports' <u>procedure</u> for approving pilotage rate increases.  We note further that despite the fact that the Pilots' due process claim rests only on the Ports' status as "interested parties," the Pilots do not define "interest" with any particularity.  Rather, they allege simply and conclusionally that because the Ports are legitimately interested parties which opposed the proposal for a pilotage rate increase at the Commission hearing, the Ports cannot constitute a fair and impartial tribunal before which the Pilots must present the same proposal at the subsequent port proceedings.[31]  Implicit in this argument is the contention that the Ports are biased by virtue of their having prejudged the facts of the rate-making issue prior to adjudicating that same issue at their own proceedings.

The Ports do not dispute that (1) they have an interest in the economic viability of their respective ports, or (2) their representatives attended the Commission hearings and opposed the proposed rate increases.[32]  These undisputed facts relating to the

_____

[31]<u>See</u> TEX. REV. CIV. STAT. art. 8267(c)(4) (West 1994) (mandating that all parties that have demonstrated a legitimate interest in rate application shall have right to speak, present evidence, and cross examine (to extent possible) at Commission hearings).

[32]The Ports do argue, however, that as they were denied the opportunity to present evidence at the Commission hearing, they were not actually an <u>interested</u> party in the hearings.  Arguably, according to Pilots' definition of "interested party," only the Port of Beaumont could qualify as an interested party, as it was the only Port that testified at the Commission hearing.

16

Ports' "interest" apparently persuaded the district court to grant summary judgment in favor of the Pilots. But, the district court went beyond that simple conclusion, labeling the Ports' interest as "pecuniary," and observing that the Ports' had a "pecuniary interest in the flow of vessels through their ports which is affected by the rates for pilot fees." In light of this perception the district court concluded that, by granting the Ports a final veto over the applications requesting an increase in pilotage rates, the subject sentence of the statute deprived the Pilots of their right to a fair and impartial tribunal. As we are satisfied that the district court erred as a matter of law in reaching this conclusion, we analyze the Ports' "interest" in light of the relevant due process caselaw and distinguish it from the only two categories of bias under which the Pilots' due process claim and the district court's ruling could fall: (1) Actual bias or probability of actual bias stemming from a pecuniary interest; or (2) irrevocably closed minds as the result of prejudging the issue.

1. Actual Bias

A fair trial before a fair and impartial tribunal, whether a court or administrative agency, is a basic requirement of due process.[33] "Not only is a biased decisionmaker constitutionally unacceptable, but 'our system of law has always endeavored to

_____

[33]Withrow v. Larkin, 421 U.S. 35, 46-47 (1975) (citing In re Murchison, 349 U.S. 133, 136 (1955)); Gibson v. Berryhill, 411 U.S. 564, 579 (1973).

17

prevent even the probability of unfairness.'"[34]  In an effort to prevent "even the probability of unfairness," courts have identified situations in which the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable.  Such situations include circumstances in which the adjudicator has a <u>direct</u>, <u>personal</u>, <u>substantial</u>, and <u>pecuniary</u> interest in the outcome of the case or in which the adjudicator has been the target of personal abuse or criticism from the party before him,[35] or "situation[s] . . .  which would offer a possible temptation to the average . . . judge to . . . lead him not to hold the balance nice, clear and true."[36]  These identified situations, as applied to due process claims, represent the standard for reviewing allegations of bias against <u>judicial</u> and <u>quasi-judicial</u> decision-makers.[37]

---

[34]<u>Withrow</u>, 421 U.S. at 47.

[35]<u>Aetna Life Ins. Co.</u>, 475 U.S. at 825-26; <u>Withrow</u>, 421 U.S. at 47; <u>Tumey</u>, 273 U.S. at 523; <u>United States v. Couch</u>, 896 F.2d 78, 81 (5th Cir. 1990).

[36]<u>Couch</u>, 896 F.2d at 81 (quoting <u>Aetna Life Ins. Co.</u>, 475 U.S. at 822); <u>Brown v. Vance</u>, 637 F.2d 272, 278 (5th Cir. 1981) (citing <u>Tumey v. State of Ohio</u>, 273 U.S. 510, 532 (1927)).

[37]<u>See</u> <u>Aetna Life Ins. Co. v. Lavoie</u>, 475 U.S. 813, 826 (1986) (holding that state supreme court justice's failure to recuse himself from case in which he had direct stake in outcome of case violated due process; holding that, while remaining justices may have had slight pecuniary interest in case, interest could not be classified as direct, personal, substantial, and pecuniary, thus participation of remaining justices did not violate due process); <u>Gibson v. Berryhill</u>, 411 U.S. 564, 578-79 (1973) (affirming district court's holding that substantial pecuniary interest of administrative adjudicators was sufficient to disqualify them from adjudicating state law complaints against competitors); <u>Ward v. Village of Monroeville, Ohio</u>, 409 U.S. 57, 59-61 (1972) (holding that mayor's dual responsibilities for village finances - derived

18

The Supreme Court has determined, however, that the strict requirements of neutrality imposed on these types of decision-makers are not applicable to situations involving nonjudicial decision-makers.[38]  In Marshall v. Jerrico, Inc.,[39] the Supreme Court determined that a federal administrator, who, despite the enforcement aspects of his position, performed no judicial or quasi-judicial function, heard no witnesses, and ruled on no disputed factual or legal questions in carrying out his enforcement tasks.  The Court concluded that the administrator functioned in a capacity more akin to that of a prosecutor or civil plaintiff than a judge.[40]  In light of the noted distinctions between the administrator's functions and those of a judge, the Court held that the rigid due process requirements imposed on individuals

in part from fines levied by mayor's court - and presiding over mayor's court violated due process rights of defendants appearing before mayor's court); In re Murchison, 349 U.S. 133, 139 (1955) (holding that judge who functioned as grand jury and judge for same defendants violated due process by virtue of fact that judge was not wholly disinterested in conviction or acquittal of accused); Tumey v. State of Ohio, 273 U.S. 510, 523 (1927) (observing that it violates due process to subject defendant to judgment of court in which judge has direct, personal, substantial, and pecuniary interest in reaching a conclusion against defendant).

[38]See, e.g., Concrete Pipe and Products of Cal., Inc. v. Construction Laborers Pension Trust for S. Cal., 113 S.Ct. 2264, 2277 (1993) (observing that rigid requirements for officials performing judicial or quasi-judicial functions are not applicable to those acting in prosecutorial or enforcement-like capacity); Marshall v. Jerrico, Inc., 446 U.S. 238, 243 (1980) (concluding that strict requirements of neutrality under Tumey and Ward are not applicable to administrative determinations made by government administrator, whose functions resemble those of prosecutor more closely than those of judge).

[39]446 U.S. 238 (1980).

[40]Id. at 247.

19

performing judicial or quasi-judicial functions are not applicable to individuals acting in a prosecutorial or plaintiff-like capacity.[41] Thus, according to the Supreme Court, an administrator who functions in a prosecutorial or plaintiff-like capacity is not held to the strict requirements of impartiality imposed on those whose functions are essentially judicial in nature. This is not to say that there are no due process limits on those who perform prosecutorial or plaintiff-like functions: As public officials, these individuals still must "serve the public interest" and not be "motivated by improper factors" or otherwise act "contrary to law."[42]

Clearly the Ports are more akin to administrative prosecutors than to those who perform judicial or quasi-judicial functions. The Ports function as policymakers who are authorized by state law to establish the rates for pilotage into and out of the individual ports. In establishing the pilotage rates, the Ports hear no witnesses (in a judicial sense) and issue no findings or rulings on factual or legal questions. Thus, under <u>Marshall</u>, to avoid judicial scrutiny of their individual port hearings, the Ports need only act according to their public interests, within the confines of the law and untainted by any substantial personal interest.

The burden of establishing a disqualifying interest on the part of the Ports is on the Pilots.[43] In this instance, a "port"

---

[41]<u>Id.</u> at 248.

[42]<u>Id.</u> at 249.

[43]<u>Schweiker v. McClure</u>, 456 U.S. 188, 196 (1982).

is a navigational district, an entity whose identity is inseparable from the individuals who comprise the district. Thus, in challenging the Ports' role as "adjudicator" over pilotage rates, the Pilots of necessity challenge those individuals who are the Ports. It is therefore the "interest" of those individuals that determines the "interest" of the Ports. And, unless those <u>natural persons</u> have a disqualifying interest, there is no disqualifying interest on the part of the artificial or juridical person they comprise, i.e., the Ports.

As noted above, the Pilots challenge the Ports' status as "interested parties" but do not allege with particularity any "disqualifying interest." The Pilots offer no evidence that the Ports were not acting according to their public interest in vetoing the pilotage rate proposal. And our de novo review of the record reveals nothing to suggest that the Ports qua Ports cannot hold the balance between the role of a decisionmaker on behalf of the public and the ports on the one hand and the Pilots' request for rate increases on the other.[44] We assume, in such balancing, that the Ports, through their individual members, recognize that shipping is the lifeblood of the ports; that the Pilots are indispensable to ship traffic; and that the pilotage rates are of vital importance to the Pilots. Likewise, we assume that the Ports are aware that pilotage rates that are too low will result in a dearth of pilots, whereas rates that are too high will make the Ports noncompetitive.

---

[44]<u>See</u> <u>Couch</u>, 896 F.2d 78, 81 (5th Cir. 1990) (citing <u>Aetna Life Ins. Co.</u>, 475 U.S. at 822)).

21

We surmise that in an effort to reconcile these two extremes, the Ports do in fact hold the balance on behalf of the public, seeking a happy medium in which both the ports and the Pilots can co-exist and function.

We observe that the Pilots do not contend on appeal that the Ports violated Texas law or that the Ports' decision to veto the rate increase was motivated by any substantial personal interest. And, as we noted above, our de novo review of the record reveals nothing to suggest that there would have been any support for such allegations had they been presented. We conclude, therefore, that the Pilots have failed to state any constitutional due process violation based on a "disqualifying interest" of the Ports. Accordingly, we hold that the district court erred as a matter of law in granting summary judgment in favor of the Pilots on the basis of the Ports' interest.[45]

2. Irrevocably Closed Minds

---

[45]As we conclude that the Pilots' failed to allege a constitutional violation based on a disqualifying interest, we need not discuss the district court's specific conclusion that the pecuniary interest of the Ports in the flow of vessels through their ports rendered unconstitutional the Ports' power to veto the pilotage rates. We do note, however, that, despite the fact that a financial or personal interest could in some circumstances render an administrator's authority unconstitutional, the Ports' economic interest in their respective ports is too remote to violate the constraints applicable to the financial or personal interests of officials charged with prosecutorial or plaintiff-like functions. See, e.g., Marshall v. Jerrico, Inc., 446 U.S. 238, 250-51 (1980) (declining to define with precision what limits there may be on a financial or personal interest of one who performs prosecutorial function, concluding that disqualifying interest alleged was too remote to impose bias); Hortonville Joint Sch. Dist. No. 1 v. Hortonville Educ. Ass'n, 426 U.S. 482, 491-92 (1976) (concluding that board members did not have kind of personal or financial stake in challenged decision that might create a conflict).

We also conclude that the Pilots' implicit allegation that the Ports' "minds" were irrevocably closed to the proposed pilotage rates by having prejudged the facts of the rate-making "dispute" prior to adjudicating that same "dispute" at their own proceedings is without merit. The contention that a tribunal is unconstitutionally biased because it has prejudged the facts of a particular dispute carries a more difficult burden of persuasion than a claim based on actual bias.[46] Allegations of bias based on the prejudgment of the facts or outcome of a dispute generally stem from the fact that an administrative body or hearing officer has dual roles of investigating and adjudicating disputes and complaints. In situations in which this type of bias is raised, the honesty and integrity of those serving as adjudicators is presumed.[47] In addition, "there is a presumption that those making decisions affecting the public are doing so in the public interest."[48] Thus, a party challenging this presumption of honesty must convince the court that "under a realistic appraisal of psychological tendencies and human weakness, conferring investigative and adjudicative powers on the same individuals poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately

---

[46]Withrow, 421 U.S. at 47.

[47]Id. ; United States v. Batson, 782 F.2d 1307, 1313 (5th Cir. 1986), cert. denied, 477 U.S. 906 (1986).

[48]Bakalis v. Golembeski, 35 F.3d 318, 326 (7th Cir. 1994) (emphasis added).

23

implemented."[49]

Although courts have observed that an administrative body that has prejudged the facts or the outcome of a dispute cannot render a decision that comports with due process,[50] we have held that we will not infer bias when no evidence is presented to indicate that a hearing officer's mind was irrevocably closed.[51]  Here, we are satisfied that, even in light of the fact that the Ports attended the Commission hearing, presumably in firm opposition to the pilotage rate increase, there still is nothing in the summary judgment record of this case to suggest that, at the subsequent port proceedings, the Ports' minds were irrevocably closed regarding the rate increase.

Indeed, the record supports just the opposite determination, that the Ports' minds were <u>not</u> irrevocably closed.  The summary judgment evidence reflects that the Ports permitted the Pilots to present testimony and evidence in support of their proposal, including an opportunity for questions and answers.  In addition, rather than veto the rate increase "on the spot" - as one might

---

[49]<u>Withrow</u>, 421 U.S. at 47.

[50]<u>See</u> <u>Bakalis</u>, 35 F.3d at 326; <u>Patrick v. Miller</u>, 953 F.2d 1240, 1245 (10th Cir. 1992).

[51]<u>See</u>, <u>e.g.</u>, <u>DCP Farms v. Yeutter</u>, 957 F.2d 1183, 1188 (5th Cir. 1992) (noting that even though appearance of bias was present, standards governing administrative proceedings are more relaxed than those controlling judicial proceedings:  "[a]n administrative decision will be overturned only when the hearing officers' mind is irrevocably closed or there was actual bias"), <u>cert. denied</u>, 113 S.Ct. 406 (1992); <u>Batson</u>, 782 F.2d at 1315 (concluding that appellant presented no evidence indicating that hearing officer's mind was irrevocably closed or from which to infer bias).

expect from those whose minds are irrevocably closed - the Ports assigned to board members or members of the ports' staffs the task of studying the proposed rate increase, and instructed these individuals and committees to address the issues relating to the increase and to report back at the next meeting. On at least one occasion a representative of the Pilots met separately with a representative of the Ports to discuss the Pilots' proposal. Clearly, this evidence supports our determination that there is no credible suggestion that the Ports had irreversibly prejudged the facts to the extent that their minds were permanently closed to the issue of the rate increase or that the Ports' administrative procedures posed an unacceptable risk of bias.[52]

### III

### CONCLUSION

Appellants assert on appeal that the district court erred in failing to abstain from exercising its jurisdiction in this dispute. As we determine that abstention is not appropriate in this case, we do not remand this issue to the district court to consider abstention, but instead hold that the district court did

---

[52]See, e.g., Dell v. Board of Educ., TP High School Dist. 113, 32 F.3d 1053, 1067 (7th Cir. 1994) (relying on Roland, infra; concluding that plaintiff-appellant failed to rebut presumption that administrative decisionmaker had acted in a fair and impartial manner by failing to allege a factual basis revealing bias or prejudice); Roland M. v. Concord School Comm., 910 F.2d 983, 997-98 (1st Cir. 1990) (concluding that record was barren of any credible suggestion that hearing officer had prejudged facts when party raising claim of bias was permitted to present evidence, examine witnesses, argue, and object, where objections were considered fully and when rejected were explained), cert. denied, 499 U.S. 912 (1991).

not err in exercising its properly invoked jurisdiction.

We hold further that the Pilots have failed to allege a due process violation to support their challenge to Art. 8267(c)(5). We are satisfied that there is no disqualifying interest affecting the judgment of the Ports regarding the pilotage rates. We are equally satisfied that there is nothing to suggest that the Ports had so prejudged the pilotage rate issue to the extent that they were impermissibly biased. We hold, therefore, that the district court erred as matter of law in concluding that the Ports' "interest," in combination with the statutory veto permitted by Article 8267(C)(5), violates due process, and therefore erred in striking the "veto" provision in that statute as unconstitutional. Accordingly, we reverse and vacate the district court's order granting summary judgment in favor of the Pilots, and render summary judgment in favor of Appellants, dismissing the Pilots' action in this case.

REVERSED, VACATED, and RENDERED.