**REVISED**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

No. 96-30441

VIRGIE LEE VALLEY; ET AL.,

Plaintiffs,

versus

RAPIDES PARISH SCHOOL BOARD; SYLVIA PEARSON;
WALTER GATLIN; HERBERT DIXON; KENNETH DOYLE;
STANLEY MILLER; RODESA METOYER, in their official capacities,

Defendants-Appellants,

versus

BETTY J. COX,

Intervenor-Appellee.

Appeal from the United States District Court
for the Western District of Louisiana

July 24, 1997

Before DUHÉ, BENAVIDES and STEWART, Circuit Judges.

CARL E. STEWART, Circuit Judge:

Appellants appeal the district court's grant of a preliminary injunction reinstating appellee Dr. Betty Cox ("Cox") as Rapides Parish School Superintendent. Appellants voted to terminate Cox after conducting a fifty-five-hour hearing in which they determined that Cox was unfit to continue as superintendent. After a careful review of the record, we affirm the grant of the preliminary injunction.

**BACKGROUND**

Cox was permitted by the district court to intervene in this longstanding school desegregation case in order to contest the constitutionality of her employment termination. No school

desegregation issues are implicated by this appeal, indeed our sole focus on review is the employment relationship between a parish school superintendent and the school board employer. On March 7, 1994, Cox, Intervenor-Appellee, was appointed as the Superintendent of Schools for Rapides Parish by the Rapides Parish School Board (the "Board"). In her position, Cox was responsible for an entire school system with approximately 25,000 students, 3,000 employees, and an annual budget of about $90,000,000.00. In her new position, Cox immediately began to institute changes concerning patronage hiring by Board members, self-dealing, and abusive use of a wide area telephone service ("WATS") phone line.

A year after her appointment, on March 7, 1995, by a vote of six to three, the Board suspended Cox with pay pending an investigation of allegations concerning her performance. Cox did not receive prior notice of the charges or a separate hearing. On March 13, 1995, Cox filed a motion to intervene and an intervention complaint in the school desegregation case against the Board and the six members of the Board who had voted to suspend her. The complaint alleged violation of Cox's federally protected rights and sought redress under 42 U.S.C. § 1983.

The district court, Judge Nauman Scott, granted Cox's motion and issued a temporary restraining order reinstating Cox pending a hearing on her request for preliminary and permanent injunctive relief. Subsequently, Judge Scott recused himself and the case was reassigned to Judge F.A. Little, Jr. Judge Little scheduled a hearing on Cox's motion for a preliminary injunction and restricted the issue to whether the Board had violated Cox's due process rights by not giving her prior notice of the allegations and a hearing. On April 21, 1995, Judge Little granted Cox's request for a preliminary injunction.

The Board and its six-member defendants appealed the ruling to this Court. The appellants argued that the district court erred in its ruling that Cox's due process rights were violated by her suspension with pay pending investigation of the allegations against her and the district court erred by not addressing the qualified immunity defense raised by the Board members in their individual capacities.

While the appeal was pending before this Court, the Board proceeded with its investigation of the charges against Cox. A discharge hearing was scheduled for November 29, 1995. The hearing lasted fifty-five hours, over five days, and culminated in the termination of Cox on December 4, 1995, by a vote of six to three. On December 7, 1995, Cox filed an amended complaint seeking reinstatement of the temporary restraining order, preliminary and permanent injunctive relief. The temporary restraining order was denied on December 14, 1995, and a hearing on the motion for preliminary injunction was scheduled for January 2, 1996.

On February 29, 1996, the district court granted Cox's request for preliminary injunctive relief, holding that Cox's substantive due process rights to fair and impartial adjudicators at the discharge hearing were violated because four of the nine Board members (Kenneth Doyle, Walter Gatlin, Herbert Dixon, and Sylvia Pearson) were irreversibly biased against her. On April 10, 1996, the district court entered formal judgment granting Cox preliminary injunctive relief and reinstating her as superintendent. The injunction was issued only against the Board, not against the six members in their individual capacity. The Board and its six individually named members, however, filed a notice of appeal on April 19, 1996. Subsequently, this Court dismissed the previously pending appeal without "prejudice to the appellants' right to raise, in any subsequent proceeding, the issues of qualified immunity and due process."

On June 10, 1996, the Board sought and was granted a motion for leave of court to raise unresolved issues from the previous appeal with this Court.

## STANDARD OF REVIEW

We review the district court's grant of a preliminary injunction under an abuse of discretion standard. *Hull v. Quitman County Bd. of Educ.*, 1 F.3d 1450, 1453 (5th Cir. 1993); *Allied Mktg. Group, Inc. v. C.D.L. Mktg., Inc.*, 878 F.2d 806, 809 (5th Cir. 1989), *app'l dec'd*, 915 F.2d 1567 (1990). The grant of injunctive relief is an extraordinary remedy which requires the movant to unequivocally show the need for its issuance. *Allied*, 878 F.2d at 809.

## DISCUSSION

3

On appeal, the Board asserts several arguments related to the two injunctions granted by the district court. First, the Board argues that the district court abused its discretion when it granted Cox preliminary injunctive relief on February 29, 1996. Specifically, the Board argues that the district court erred in its conclusion that Cox carried her burden of proving that she had a substantial likelihood of success on the merits because (1) Cox waived her right to challenge the partiality of various Board members, (2) it was erroneous to conclude that Board members Doyle, Gatlin, Dixon and Pearson were irreversibly biased against Cox and should be recused, (3) the rule of necessity applies to the instant case, and (4) the district court failed to make sufficient findings of fact pursuant to FED. R. CIV. P. 52(a). The Board also argues that the district court erred in concluding that Cox had proven (1) a substantial threat of irreparable injury if the preliminary injunction was not issued, (2) the harm to her, if the injunction was denied, exceeded the hardship to the appellants, and (3) the public interest would not be undermined by issuance of the injunction.

Second, the Board argues that the district court abused its discretion when it granted Cox preliminary injunctive relief on April 21, 1995. Specifically, the district court erred as a matter of law in concluding that temporary suspension with pay constituted deprivation of property interests. Also, the district court erred by disregarding the doctrine of qualified immunity.

Cox, on the other hand, argues that the district court properly applied the standards for issuance of a preliminary injunction. Moreover, Cox argues that she did not waive her right to challenge the bias of her adjudicators, the rule of necessity is inapplicable to the instant case, the district court's findings of fact are in compliance with FED. R. CIV. P. 52(a), and the issues of the April 21, 1995, appeal are moot.

After considering the full extent of the Board's arguments, we are left with the firm conclusion that only the Board's arguments concerning the February 29, 1996 preliminary injunction

4

warrant full discussion.  We agree with Cox that the Board's arguments regarding the 1995 preliminary injunction are either  moot or without merit.[1]

## I. <u>Did the District Court Abuse its Discretion When it Granted Preliminary Injunctive Relief to Superintendent Cox Against the Rapides Parish School Board on February 29, 1996</u>?

Under well settled Fifth Circuit precedent, a preliminary injunction is an extraordinary remedy that should not be granted unless the movant demonstrates by a clear showing: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction is not granted; (3) that the threatened injury outweighs any harm that may result from the injunction to the non-movant; and (4) that the injunction will not undermine the public interest.  On appeal, a preliminary injunction order must not be disturbed unless grounded upon a clearly erroneous factual determination, an error of law, or an abuse of discretion.  *Roho Inc. v. Marquis*, 902 F.2d 356, 358 (5th Cir. 1990).

### A. <u>Likelihood of Success on the Merits</u>.

To determine the likelihood of success on the merits, we look to the standards provided by the substantive law.  *See Mississippi Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 622 (5th Cir. 1985).  Before the district court, Cox argued that her termination was a violation of her procedural due process rights guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution because four members of the Board who voted against her were irreversibly biased.  As we stated, the Board asserts that Cox waived this argument by waiting until after she was terminated to seek recusals and that the rule of necessity precluded the Board members' recusal. The Board also argues that the district court's factual findings were both erroneous and did not comport with the mandates of Rule 52(a).  We will address each of these contentions in turn.

---

[1]First, the previous appeal involved the issue of suspension with pay pending the investigation of the charges against Cox.  That issue was rendered moot by the completion of the investigation, Cox's hearing, and Cox's  termination by the Board.

Second, the appellants' argument of qualified immunity is without merit.  It is well established law in this Circuit that the defenses of qualified and absolute immunity do not extend to suits for injunctive relief under 42 U.S.C. § 1983.  *Chrissy F. By Medley v. Mississippi Dept. of Public Welfare*, 925 F.2d 844 (5th Cir. 1991).

**1. *Waiver.***

We find the Board's argument that Cox waived her right to seek recusal of the various Board members without merit. The Board argues that Cox was apprised of evidence of the alleged partiality of the Board members as early as the April 1995 injunction hearing, yet she did not seek recusals at that time. Instead, it argues, she waited until after the November 1995 termination hearing when she was terminated, to seek recusals. This argument is both unfounded in the law and on the facts. It was not through strategy or neglect that Cox waited to seek recusals. The district court limited the scope of the April 1995 hearing to only the issue of Cox's removal without procedural due process. In fact, the court denied Cox's motion to expand the scope of the hearing to include "evidence of retaliation" and other related evidence. Cox was forced to wait until the November 1995 termination hearing to move for recusals. Not surprisingly, at the November 1995 hearing, the Board, which consisted of the members whom Cox sought recusal, refused to consider Cox's motion for recusal. Cox was thus forced to wait until after the November 1995 hearing to seek the redress she sought twice before. Further, the cases the Board cites in support of its argument are factually distinguishable and minimally relevant. We therefore reject this argument.

**2. *Rule of Necessity.***

Appellants next argue that the rule of necessity requires that the recused Board members, even if biased, be restored to their positions on the Board. We find this argument unpersuasive. Essentially, the rule of necessity requires an adjudicatory body (judges, boards, commissions, etc.) with <u>sole or exclusive</u> authority to hear a matter to do so even if the members of that body may have prejudged the results of a particular hearing. While it is true that the rule of necessity ordinarily mandates the inclusion of board members, even those who have a bias against a party they must preside over, the rule is not implicated in this case. As the district court stated, the rule of necessity is not implicated where recusals based on bias do not deprive the board of a quorum. (citing *Bakalis v. Golembeski*,

35 F.3d 318, 327 n. 11 (7th Cir. 1994)).[2] The Board argues that Cox has wrongfully been allowed to "pick and choose" which Board members to recuse, while maintaining a quorum. Notably, the Board fails to cite any legal authority for its claim that this court must evaluate Cox's motive for only seeking recusals of four Board members and not all six (including Stan Miller and Rodesa Metoyer) against whom Cox made allegations of bias. We interpret the rule of necessity to apply only in situations where a sole adjudicatory body would be precluded from carrying out its function because of disqualifications. Such is not the case before us. Louisiana law provides that a superintendent "shall be removable for such cause by a majority vote of the membership of the school board at any regular meeting or at any special meeting after due notice." *See La. Atty. Gen. Op. No.* 77-195, 1977 WL 34537 (La.A.G. 1977). We read this language to mean a majority of the board members eligible to vote, not a majority of the whole board. *Cf. La. Atty. Gen. Op. No.* 84-902, 1984 WL 195737 (La.A.G. 1984) (opining that where there was an eight-man school board and one member died, four members constituted a quorum for voting purposes). Thus, a quorum existed after the four Board members were recused, which allowed the Board to function by majority vote. *Bakalis*, 35 F.3d at 327 n. 11. We therefore reject this argument.

### 3. *Determining Partiality and the District Court's Factual Findings*.

The basic requirement of constitutional due process is a fair and impartial tribunal, whether at the hands of a court, an administrative agency or a government hearing officer. *Gibson v. Berryhill*, 411 U.S. 564, 569 (1973). The Supreme Court has consistently enforced this basic procedural right and held that decision makers are constitutionally unacceptable in the following circumstances: (1) where the decision maker has a direct personal, substantial, and pecuniary interest in the outcome of the case; (2) where an adjudicator has been the target of personal abuse or criticism from the party before him; and (3) when a judicial or quasi-judicial decision maker has the dual role

---

[2]*See also Bourgeois v. Orleans Parish School Board*, 53 So.2d 251, 256 (La. 1951) (quoting general rule that "a member of an administrative board who is biased or prejudiced against one on trial before the board is not required to withdraw from the hearing . . . if his withdrawal would deprive the board of the number of members required to take a valid affirmative vote") (citation omitted).

of investigating and adjudicating disputes and complaints. *See Baran v. Port of Beaumont Navigation Dist. of Jefferson County*, 57 F.3d 436, 444-46 (5th Cir. 1995).

The third situation is the one at issue in the instant case. The problem of a procedural defect arises when the decision makers have prejudged the facts to such an extent that their minds are "irrevocably closed" before actual adjudication. *Id.* at 446. Nevertheless, bias by an adjudicator is not lightly established. The movant must overcome two strong presumptions: (1) the presumption of honesty and integrity of the adjudicators; and (2) the presumption that those making decisions affecting the public are doing so in the public interest. Yet, both the Fifth Circuit and the Supreme Court have recognized that a movant challenging the two presumptions may convince a court that "under a realistic appraisal of psychological tendencies and human weaknesses, conferring investigative and adjudicative powers on the same individuals poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented." *Id.* (quoting *Winthrow v. Larkin,* 421 U.S. 35, 47 (1975)).

The Supreme Court has held that in some instances, a school board's decision is a legislative decision—not adjudicative—such that the decision has significant governmental and public policy dimensions that allow it (the school board) to make decisions in the public interest even if it is prejudiced to a particular party.[3] Nevertheless, adjudicative decisions, or issues not of a legislative, policy or legal nature, should be free of bias or prejudice. Thus an adjudicative decision maker should be disqualified if he or she has prejudged disputed adjudicative issues. Moreover, in the context of school or college boards, appellate jurisprudence has favored recusing board members who display a bias or prejudice that would result in an unconstitutional decision.[4]

---

[3]*See Hortonville Joint School District v. Hortonville Educational Assn.*, 426 U.S. 482, 494-95 (1976).

[4]*See Bakalis*, 35 F.3d at 326 (distinguishing *Hortonville* and holding that, in light of "running controversy" between plaintiff and the board in which plaintiff had criticized some board members' conduct as "harmful" and "unethical" to which board members responded with public criticism of plaintiff's job qualifications, there was sufficient evidence of prejudgment to render the hearing "violative of due process"); *Hall v. Morrison School District*, 31 F.3d 183, 192 (4th Cir. 1994) (acknowledging strong presumption of impartiality but holding "the board was actually biased against Hall, overcoming any presumption of impartiality afforded the board," when members of the board were involved in a vendetta against Hall because of her harsh public

Applying the foregoing legal principles to the first prong of the preliminary injunction requirements, the district court cogently addressed each of the Board's arguments and held that "four board members had reached prehearing commitments on questions of adjudicative fact, thus establishing an unconstitutional level of impartiality." Upon our careful review of the February 29, 1996 ruling of the district court, we find that the district court did not abuse its discretion when it granted a preliminary injunction in favor of Cox. The Board argues, however, that the district court failed to make adequate findings of fact pursuant to FED. R. CIV. P. 52(a), particularly regarding Board members Dixon and Pearson.[5] We disagree.

Rule 52(a) provides that in cases tried before the court without a jury, the court shall find the facts specially and state separately the conclusions of law thereon. Where trial court findings are couched in a conclusory fashion, appellate courts have remanded cases so that the trial court may provide the reviewing court with a "clear understanding of the analytical process by which ultimate findings were reached . . . ." *Hydrospace-Challenger, Inc. v. Tracor/MAS, Inc.*, 520 F.2d 1030, 1034

---

criticism of the board); *Staton v. Mayes*, 552 F.2d 908 (10th Cir.), *cert. denied*, 434 U.S. 907 (1977) (distinguishing *Hortonville* and holding that school board member who made public statements pledging to remove superintendent was unconstitutionally biased in voting to discharge the superintendent at a hearing called for that purpose).

[5]We are convinced that the district court was keenly aware of its Rule 52(a) responsibilities because of the manner in which it prefaced its findings. The court stated in pertinent part:

> Having outlined the due process principles that must govern this case, we now turn to the factual record before us. To say the least, this record reeks with <u>copious and unmistakable evidence of partiality</u>. We will name but a few of the events that, in out judgment, demonstrate beyond a reasonable doubt that Mrs. Cox did not get the hearing to which she was constitutionally entitled. There are many incidents, but the following is more than ample evidence that an impartial body did not receive the evidence that was tendered to it.
>
>  . . . .
>
> In sum, the record is <u>replete with evidence that at least four panel members harbored sufficient indicia of partiality to render a hearing a parody of justice</u>. As we said, the record is overwhelming with such evidence; the cited situations represent only those that stand in the brightest relief.

District Court's Ruling at 13, 15 (emphasis added).

9

(5th Cir. 1975). The Board argues that this case should be "remanded to the district court for further consideration so that a sufficient predicate for appellate review can be established." Although the Board's argument has a recognized legal basis, Rule 52(a) does not require that the district court set out findings on all factual questions that arise in a case. *Golf City, Inc. v. Wilson Sporting Goods Co., Inc.*, 555 F.2d 426, 433 (5th Cir. 1977). We will briefly highlight part of the factual predicate found in the record upon which the district court based its decision.

### a. Dixon and Pearson.

When the district court ruled that Dixon and Pearson were irreversibly biased, it gave the following explanation: "In the interest of avoiding further exacerbation of what was a tender subject, we will temper our opinion and not mention or detail the disqualifying events concerning Board members Dixon and Pearson. We will recognize, however, that their prehearing protestations rose to the level of irreversible partiality and bias." After reviewing the record we have no doubt about the factual basis for the district court's finding of bias on the part of Dixon and Pearson. Both Dixon and Pearson were embarrassed publicly by an investigation of abusive use of the WATS telephone line maintained by the Board. Though not denying their actions, they later voiced their objection over the handling of the investigation and stated how their opinion of Cox changed after this incident. Board member Ruth O'Quinn testified at the 1996 injunction hearing that she had "never seen Pearson as angry as she was the night that her name had surfaced regarding the WATS line." O'Quinn also testified to Pearson's and Dixon's statements regarding how the WATS line investigation had been the turning point of the relationship between the Board and Cox.[6] In addition, Cox testified that at the March 1995 school board hearing—when the Board voted to suspend her—Dixon stated that her tenure as superintendent had "come under siege."

---

[6]O'Quinn testified that Pearson stated there were eight solid votes for Cox until the WATS line incident, and Dixon spoke up and said, "no, nine" (meaning not eight, but nine votes were in her favor before the investigation). O'Quinn believed that those statements were indicative of the partiality of the Board during the hearing.

The record also showed that despite a court order limiting the Board's hiring power, Dixon sought to circumvent that order by instructing several school system employees to make certain hiring decisions of his choosing. Jane Swearingen, Principal of Acadian Sixth Grade Center, testified that Dixon left notes on several occasions instructing her to carry out his hiring recommendations, in direct contravention of the court order. Swearingen also testified that Dixon stated they could work around the court order. Undoubtedly the district court concluded that Dixon knew that Cox had petitioned the court for the very order he was trying to circumvent. This knowledge coupled with his actions testified to by Swearingen was typical of the quality of the evidence the district court had before it when it found bias on the part of Dixon and Pearson.

### b. Doyle.

Similarly, evidence of bias on the part of Board member Doyle was well documented in the record and substantiated the district court's findings. The court described the evidence concerning Doyle as "most overpowering." The district court specifically noted that Doyle's "prehearing statements in public and to the media that promised a firing for Betty Cox, when coupled with open hostility to compliance with the court order concerning hiring recommendations that had been obeyed by Mrs. Cox, presented more than adequat e pro of of partiality." Specifically, Wendy Sledd a/k/a Wendy Williams, a reporter for KRRV Radio, testified at the 1996 injunction hearing that Doyle stated to her on November 17, 1995 that the November 29, 1995 school board hearing was "D-Day" for Cox and that "she would be fired."

In addition, Cox testified about how on occasion Doyle would call "irate" and "screaming" wanting to know why Cox recommended a person for a position over a person he recommended for the position, even though he was aware of the court's order prohibiting such acts. The district court obviously construed this testimony as showing Doyle's refusal to adhere to the court's order prohibiting recommendations of that kind and further evinced Doyle's animosity toward Cox. This

11

conclusion was buttressed by O'Quinn's testimony that at a board meeting preceding the discharge hearing, Doyle again voiced his discontent over Cox's failure to hire a person he had recommended and was overheard saying Cox "should be fired." These incidents are but a few of the plethora of evidence in the record upon which the district court based its finding of partiality.

### c. **Gatlin.**

Evidence of Board member Gatlin's bias was probably the most publicly documented of all the Board members. Cox uncovered Gatlin's practice of self dealing prior to his election to the School Board. While with the Special Education Department of the School System, Gatlin bought equipment from a company he owned to service a nonprofit organization which he was on its board of directors and which provided services for the Rapides Parish school system. A federal investigation took place—initiated by Cox—which resulted in Gatlin's forced resignation from his position as a member of the board of directors of the nonprofit organization. Although Gatlin denied having known that Cox initiated the federal investigation until the 1996 injunction hearing, the investigation surrounding Gatlin's practices was well documented in the local newspaper and was public knowledge for anyone within Rapides Parish well before the injunction hearing.

Kate Swift, a Rapides Parish school employee, testified that shortly before Cox's suspension resolution was adopted, Gatlin called her at home and during the conversation stated that they (Gatlin and Swift) had lived there all their lives and that they would be there long after "that bitch is gone," referring to Cox.[7] Cox also testified that, on the day the Board amended the agenda to add the resolution to suspend Cox with pay and there had been a public outcry, Gatlin responded in defense of himself. Having voted for the resolution, he said "it was well published by the news media about where I stood. I have not changed my stance yet. I could have had my crowd here tonight, but I didn't choose to." Board member O'Quinn also stated that in her mind Cox could not and did not get

---

[7]Though Cox was not referred to by name, Swift testified that she knew Gatlin was talking about Cox because "they were trying to rid of Doctor Cox." When asked what she meant by her comment she responded that it was evident by the "negative actions by the school board" and the "general discord" at the school board meetings.

a fair hearing partly because Gatlin had "animosity" toward Cox. As a result of those incidents, and others, the district court concluded that it was "ludicrous" to believe Gatlin could sit as an "impartial adjudicator assessing the propriety of investigations conducted by Mrs. Cox when he was a party to the transactions in question."

In sum, the record in the case unfolds like a soap opera. The respective views of the parties were regularly aired out in the print and broadcast media in the Rapides Parish area. One need only make a cursory review of the exhibits and the testimony to get a clear impression of the rancor and deeply held views of the aforementioned school board members prior to the discharge hearing. Indeed, the district court's sparing recitation of the facts underlying its ruling was a tacit acknowledgment of the general public's and the school board's awareness of the details of the accusations in the case. The district court's exercise of discretion limiting the amount of discussion assigned to its finding of bias on the part of the four Board members cannot be said to have been abused.

## B. Substantial Threat of Irreparable Injury.

Although we agree with the district court's determination regarding Cox's likelihood of success on the merits, our analysis is not complete. To be entitled to an injunction, Cox was also required to show a substantial threat of irreparable injury. *Hull*, 1 F.3d at 1453. After a careful review of the record, we hold that irreparable injury has been shown. We adopt the reasoning of the district court, which concluded that

> Cox has shown not only that she has suffered a deprivation of her due process rights, but she has also provided strong evidence, in the form of an affidavit from a former school superintendent with nationwide experience in the conduct of searches to fill such positions, that the Board's biased finding of inefficiency and incompetence will inflict such severe injury to her professional reputation that a monetary award would likely be inadequate and almost certainly speculative.

(Emphasis added) (footnote omitted). We find the threat of injury to Cox's reputation and her ability to procure comparable employment, not to mention the egregious and constitutionally infirm hearing she was subject to, sufficient to satisfy irreparable injury. *See United Church of the Medical center*

13

*v. Medical Center Commission*, 689 F.2d 693, 701 (7th Cir. 1982) (finding irreparable injury when plaintiff was forced to submit to adjudication before an unconstitutionally biased public commission).

### C. Balancing of Potential Harm to Cox with the Hardship to the Board.

Next, we must balance the potential harm to Cox with the hardship to the Board if an injunction is not issued. The district court found that "allowing Superintendent Cox to continue in her executive capacity would not visit any substantial harm on the School Board, and indeed that far greater harm to both Cox and the entire school system would result from allowing the unconstitutional [termination] to stand." In light of the evidence previously discussed and the additional evidence in the record, we agree with the district court's determination that the harm to Cox caused by an unfair hearing far outweighs any harm that the Board might suffer.

### D. Harm to the Public Interest.

Finally, to complete our analysis, we must decide whether the issuance of an injunction would undermine the public interest. The district court found that the public interest would be undermined if the unconstitutional actions of the Board were allowed to stand. We agree. Moreover, the public interest is enhanced by an adjudication by the duly elected school board which comports with basic protections of due process to which all citizens are entitled. Thus, we hold that the public interest would not be undermined by upholding the injunction.

### CONCLUSION

Having read the record in detail, we agree with the district court's opinion that more than sufficient evidence exists to support issuance of the preliminary injunction. The district court thus did not abuse its discretion in issuing the preliminary injunction which returned Dr. Cox to the position of Rapides Parish School Superintendent with restitution to the emoluments of her office since the date of her discharge. Accordingly, we AFFIRM.